Ralph K. UPTEGRAFT, Appellant,

v.

STATE of Alaska, Appellee.

No. 4679.

Supreme Court of Alaska.

Dec. 5, 1980.

**6**

Sue Ellen Tatter, Asst. Public Defender and Brian Shortell, Public Defender, Anchorage, for appellant.

Charles M. Merriner, Asst. Atty. Gen., Anchorage and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

RABINOWITZ, Chief Justice.

In this case, we are called upon to decide whether certain evidence was lawfully seized from an automobile. We conclude that the stop of the vehicle was permissible, that the initial search of the vehicle was valid under the plain view doctrine, and the second search of the vehicle was justified as a search incident to a lawful arrest. We consequently affirm the ruling of the superior court denying appellant's suppression motion.

In the early morning hours of Monday, December 5, 1977, Steven Watson was working at a Qwik–Stop grocery store in Anchorage. At about 1:40 a.m., a man entered the store wearing dark shoes, black pants, a gray sweatshirt and a green ski mask. He pointed a pistol at Watson's face and told him to fill a paper bag with money. Watson gave him about $38 in currency, food stamps and change. The robber then demanded the keys to Watson's pickup truck, a white Toyota with Idaho license plates. Watson watched the robber drive off, noted his direction and called the police. A police dispatcher broadcast a description of the vehicle.

Officer Dinwiddie of the Anchorage police, who was near the scene, heard the dispatch and shortly thereafter saw, coming towards him, a white Pontiac Tempest sedan with three occupants. Dinwiddie continued driving approximately another mile and a half after passing the Pontiac. He then saw a vehicle matching the description of the stolen pickup truck parked at a turnout off the highway. Dinwiddie did not see any other moving vehicles between the time he passed the Pontiac and the time he saw the truck. In the turnout were fresh car tracks in the snow indicating that a vehicle had left, headed in the direction of the Pontiac he had just passed. Dinwiddie immediately put out a locate call on the Pontiac.

About twenty–five minutes after the robbery, Officer Cargill of the Alaska State Troopers spotted a car matching the description of the Pontiac. After checking with the dispatcher to confirm the vehicle's description, Cargill decided to stop the vehicle. Officer Lyons was nearby in another patrol vehicle and the two officers proceeded to make a stop, employing procedures for detaining suspected felons. Lyons ordered the three occupants of the car to exit from the driver's side and move to the rear of the vehicle. The driver's side door was apparently left open. As the suspects were getting out of the car, Officer Daniels of the Anchorage police arrived. Daniels assisted the other two officers in patting down the suspects. After Daniels finished pat–searching one of the suspects, he walked to the passenger side of the vehicle and, using a flashlight, looked inside the car through the back passenger window. At this time, Lyons and Cargill were still in the process of pat–searching the other suspects, while the suspects were standing at the rear of the vehicle, facing the front of the car, with their hands in front of them.

Daniels was able to see what appeared to be a folded gray sweatshirt, similar to the one worn by the robber, behind the driver's seat on the floor of the car. Underneath the sweatshirt, protruding from a green cloth bag, was something that Daniels

thought was a wooden handle of a handgun.[1]

Daniels opened the passenger door, reached into the car and retrieved from the cloth bag what he believed was the handgun. In fact, it was a sawed-off shotgun. He took the weapon, checked to see if it was loaded, and placed it in his patrol car.

After disposing of the shotgun, Officers Cargill and Daniels re-entered the vehicle. Cargill testified that he observed all the remaining items of incriminating evidence (which included the stolen money, a green ski mask, and a pistol). It is not clear from the record what items were actually removed from the vehicle at this time. Apparently, Daniels removed from the car two weapons and a license plate, missing from the rear of the car.[2]

Watson arrived at the scene of the stop about ten minutes later and positively identified one of the suspects as the man who had robbed him. The three suspects were then placed under arrest and taken away.

A motion to suppress the evidence from the warrantless searches was denied by the superior court. Uptegraft thereafter entered a plea of no contest to the robbery charge, reserving the suppression issue, was sentenced to four years' imprisonment.[3]

## I. THE INITIAL STOP OF THE PONTIAC

■ Uptegraft first contends,[4] relying principally on *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), that the police had no basis for stopping the Pontiac. *Prouse*, which held that random vehicle stops are illegal when police have no articulable basis for suspecting a legal violation, is not on point. Here the state demonstrated that the police had sufficient facts to warrant a reasonable person in the belief that the investigatory stop was justified. *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–1880, 20 L.Ed.2d 889, 906 (1968). In *Coleman v. State*, 553 P.2d 40

1. Uptegraft challenges the credibility of Daniels' assertion that he was able to see the sweatshirt and wooden handle from outside the car. He asserts that Daniels could not see through the car windows because they were frosted. Dinwiddie and Lyons both described the vehicle as having frosted windows, but neither officer would have seen the passenger side of the vehicle until it was stopped. Therefore, this testimony does not contradict Daniels' testimony that the windows on the passenger side were only frosted along the edge. Moreover, Daniels was the first officer to attempt to take a close look at the car. Uptegraft also contends that Daniels did not see the shotgun until *after* he opened the passenger car door. This is not supported by the record. Daniels' testimony was that he observed both the sweatshirt and what later proved to be the shotgun from outside the car.

2. Cargill testified that Daniels was the only officer who removed anything from the vehicle, but on cross-examination, he testified that he helped Daniels remove items from the car. Daniels testified that he seized two weapons, a ski mask and a license plate at the scene of the stop. He then corrected himself and said that he seized a nylon stocking, not a ski mask. Later in his testimony he stated that he did not see the ski mask until he was at trooper headquarters, and that he did not examine the contents of the cloth bag when he removed the shotgun. In light of our conclusion that all these items could be seized as part of a search

incident to a lawful arrest, these inconsistencies are not significant.

3. The state and the defendant filed a stipulation in superior court which stated that the state would drop the robbery charge if, on appeal, this court were to conclude that the items of evidence in the Pontiac should have been suppressed. There may be some doubt whether this issue was dispositive of the case because there was other evidence against Uptegraft that might have been used to obtain a conviction, including possible identification testimony by Watson. Nevertheless, we will not lightly upset such a stipulation where it complies with our decision in *Oveson v. Municipality of Anchorage*, 574 P.2d 801, 803 n.4 (Alaska 1978). *Compare Heuga v. State*, 609 P.2d 547 (Alaska 1980), where there was no stipulation that the issue was dispositive and the state conceded that, at the time the plea was entered, the issue was not necessarily dispositive, *with Cruse v. State*, 584 P.2d 1141, 1144 n.3 (Alaska 1978) where the prosecutor indicated that he would not have proceeded with the case without the evidence. Consequently we conclude that we have jurisdiction over this appeal.

4. The state maintains that Uptegraft cannot raise this issue on appeal because he failed to raise it at the suppression hearing. One of Uptegraft's co-defendants raised the issue at the hearing, however.

(Alaska 1976), which involved an investigatory stop of a motor vehicle, we established the test for making such stops:

> [A] police officer with a reasonable suspicion that imminent public danger exists or serious harm that has recently occurred was caused by a particular person may stop that person.

553 P.2d at 43.[5] The police in this case had seen the Pontiac near the scene of the crime, moments after it had occurred. Officer Dinwiddie testified that the Pontiac was the only vehicle he passed on the road between the time he first saw it and the time he came upon the stolen pickup truck. There were tire tracks in the snow, indicating that an automobile had headed in the direction the Pontiac was traveling. These facts were enough to infer that the lone robber had met one or more accomplices and had made his getaway in the Pontiac. Consequently, we conclude that the initial stop was permissible.

## II. THE VALIDITY OF THE FIRST SEARCH

As discussed above, after Officers Cargill and Lyons had pulled the Pontiac over, a third officer, Officer Daniels, arrived as the suspects were getting out of the car. Daniels finished pat–searching a suspect and walked to the side of the car where, with the aid of a flashlight, he could see a gray sweatshirt matching the description of that worn by the robber, and the butt of a gun. Daniels opened the car door and retrieved the gun. Uptegraft contends that these items were not in plain view because the car windows were frosted, and that the officer allegedly did not see the weapon until he opened the door. In our opinion, neither contention is supported by the evidence, and we conclude that the items were in plain view.

Uptegraft's sole remaining argument is that, having seen what appeared to be a

weapon, the police were then obligated to obtain a search warrant before they could open the car door to seize it. In *State v. Spietz*, 531 P.2d 521 (Alaska 1975), we held that police officers were not authorized to enter a house and remove some marijuana plants which they had observed through an open doorway. Plain view gave the officers probable cause to obtain a warrant to search the house, but did not by itself authorize an entry to seize the evidence.

*Spietz*, however, relies heavily on the fact that the evidence seized was the product of a warrantless entry into a person's home.

> The home has traditionally been afforded special protection under the Fourth Amendment of the United States Constitution and under the Alaska Constitution. A door of the home represents a firm constitutional barrier whether or not it is open.... Plain view alone could not justify the warrantless entry through the doorway into the constitutionally protected area of the Spietz house.

531 P.2d at 525 (footnotes omitted).

*Spietz* also relied on the United States Supreme Court case of *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 20, 22, 29 L.Ed.2d 564, *reh. denied*, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971), which also speaks in terms of *premises* in holding that plain view does not justify an intrusion and seizure.

> Incontrovertible testimony of the senses that an incriminating object is *on premises* belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure.

403 U.S. at 468, 91 S.Ct. at 2039, 29 L.Ed.2d at 584 (emphasis added).[6]

---

**5.** *See also Ebona v. State*, 577 P.2d 698 (Alaska 1978).

**6.** Although *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, *reh. denied*, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d

120 (1971), involved the search and seizure of an automobile, the vehicle was parked on the defendant's driveway when the police first seized it. Another factor of obvious importance to the Supreme Court's decision in *Coolidge* was that the police knew in advance

We have not applied *Spietz* or a similar rationale to automobiles stopped on highways, nor are we aware of any cases from other jurisdictions which have applied such a rule. One reason such a rule has not been applied is that, as we noted in *Gray v. State*, 596 P.2d 1154, 1157 (Alaska 1979), *quoting United States v. Robinson*, 533 F.2d 578, 584 (D.C.Cir.), *cert. denied*, 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976), "In the case of a car on the street there is [a] lesser expectation of privacy than in a home." In *Pope v. State*, 478 P.2d 801, 805 (Alaska 1970), *reh. denied*, 480 P.2d 697 (Alaska 1971), a police officer saw a gun lying on the front seat of the defendant's car and seized it. We decided the question on the ground that the gun could be seized because it was in plain view. Although this case arose prior to our decision in *Spietz*, we see no reason to disturb its holding today.

■ Moreover, even if we were convinced that *Spietz* was applicable to automobiles and that items in plain view within a car's interior cannot be seized without a warrant, we would not apply such a rule in this case. As discussed more fully below, the police were allowed to remove weapons from an area within the potential reach of the suspects.[7]

## III. SECOND SEARCH AND SEIZURE

Additional items of incriminating evidence related to the robbery were observed during a second search of the car that took place while the suspects and police waited at the scene of the stop. At least one other weapon and a license plate were removed at this time.[8]

■ In our opinion, this second search and seizure is justified as a search incident to a lawful arrest. As was made clear in *Goss v. State*, 390 P.2d 220 (Alaska), *cert. denied*, 379 U.S. 859, 85 S.Ct. 118, 13 L.Ed.2d 62 (1964), *overruled on other grounds*, *Glasgow v. State*, 469 P.2d 682 (Alaska 1970), in order for this exception to apply the police must have probable cause to make an arrest at the time the search and seizure takes place, but it is not necessary to formally place the suspect under arrest.[9] Once the police had viewed the sweatshirt, which was similar to the one worn by the robber, and had recovered the sawed–off shotgun, probable cause to make an arrest existed.[10]

---

where the vehicle was likely to be so the viewing of the car was not inadvertent. 403 U.S. at 469–70, 91 S.Ct. at 2040, 29 L.Ed.2d at 585.

7. As *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889, 909 (1968), makes clear, once police have made a valid stop they may then make a protective frisk of a suspect to remove weapons. In *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, *reh. denied*, 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969), the Supreme Court defined the area which can be searched incident to an arrest as that "within [an arrested person's] immediate control." 395 U.S. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. At least as to searches for weapons, both *Terry* and *Chimel* depend on the rationale that the search is authorized to protect the officer's safety. While *Terry* would not authorize a search for any purpose beyond one for weapons, *Dunn v. State*, 382 So.2d 727 (Fla.App.1980), it does make sense to hold that the permissible area that can be searched for weapons under *Terry* is co–extensive with the area that can be searched for weapons under *Chimel*. Authority for this position may be found in *Wood v. State*, 515 S.W.2d 300, 306 (Tex.Cr.App.1974) and 3 W. LaFave, Search and Seizure § 9.4, at 134–35 (1978). If the

police had enough facts to make a stop, the permissible zone for a search for weapons would be the same as that for a search incident to arrest, discussed *infra*.

8. The state maintains that another weapon was underneath the cloth bag in plain view. There is no support for this statement in the record. Furthermore, Officer Cargill testified that the weapon was in the cloth bag. As to the other contents of the cloth bag, Daniels testified that he did not see what was in the bag at the time he removed the shotgun from it. Therefore, on the present record, the second search cannot be justified on plain view grounds.

9. No formal arrest was made until Watson arrived and identified one of the suspects.

10. *Cruse v. State*, 584 P.2d 1141, 1144 (Alaska 1978), *quoting Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879, 1890, *reh. denied*, 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949), states:

Probable cause exists where 'the facts and circumstances within ... [the officers'] knowledge, and of which they had reason-

The remaining question is whether the area searched by the police could be considered an area within the suspects' "immediate control." *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685, 694, *reh. denied*, 396 U.S. 869, 90 L.Ed.2d 36, 24 L.Ed.2d 124 (1969).

The three suspects were standing at the rear of the vehicle with the driver's door open.[11] Their hands were free. The number of suspects and number of officers were equal.[12] The area searched was limited to an area inside the car that was potentially available to the suspects—the floor area immediately behind the driver's seat where the other weapon had been found. There was a high likelihood of finding at least one other weapon because the police knew a pistol was used in the robbery, but they had only found a shotgun. The fact that an armed robbery had just occurred might well have made the police believe that the suspects might use a weapon to harm an officer or attempt an escape. Finally, the cloth bag, which was open at least far enough at the top to allow a shotgun butt to stick out, could be searched because it was accessible and could have been opened quickly enough to remove a weapon.

Admittedly, it is possible that the police could have moved the suspects farther away from the car, making a search of the car unnecessary, *see* 2 W. LaFave, *Search and Seizure* § 7.1, at 505–06 (1978), and it is possible to speculate that there was a small likelihood that one of the suspects would have been able to leap into the car to obtain a weapon. Nevertheless, the reasonableness of the scope of a search incident to arrest must be viewed from the realistic perceptions of the police officer at the time the search is made, and not by a later analysis of all the possible options that might hypothetically have been considered. Under the circumstances, we think that it was prudent to search and remove any other weapons from the Pontiac, even if at the time the search was made police had the suspects under control. Such a decision would not only protect the police, it would also prevent harm to the suspects in case of a shoot–out or attempted escape. Our conclusion that the second search was lawful is supported by our own prior decisions,[13] and decisions from other jurisdictions.[14]

The judgment of the superior court denying the suppression of the evidence is Affirmed.

---

ably trustworthy information, [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.

11. Daniels testified that all the doors may have been closed, but he seems to be referring to the passenger side of the vehicle.

12. Sometime after Daniels arrived, several more· officers arrived. It is not clear if they had arrived at the time of the second search.

13. *Brown v. State*, 580 P.2d 1174 (Alaska 1978) (suspect spread–eagled between two cars when single officer removed jacket and sawed–off shotgun from car); *Daygee v. State*, 514 P.2d 1159 (Alaska 1973) (plurality opinion) (suspects inside separate patrol vehicles when police removed evidence from the car in which suspects had been riding); *Merrill v. State*, 423 P.2d 686 (Alaska), *cert. denied*, 386 U.S. 1040, 87 S.Ct. 1497, 18 L.Ed.2d 607 (1967) (suspects in handcuffs, spread–eagled on bridge abutment, when officers removed weapons from truck in which suspects had been riding). We question whether we would today still be willing to agree with the plurality in *Daygee* that

the attenuated circumstances there would be sufficient to justify a search incident to arrest. *Daygee* implies that once a defendant has had control of an automobile somehow he retains that control even though he is later moved away. Such a conclusion does not seem supported by *Chimel*'s "immediate control" test, which suggests an immediacy in both time and space. *Daygee* has been criticized on this ground by Professor LaFave, 2 W. LaFave, Search and Seizure § 7.1 at 500 n.14 (1978). *See also* Note, *The Effect of Chimel v. California on Automobile Search and Seizure*, 23 Okla.L.Rev. 447, 452 (1970). Nevertheless, while we might question *Daygee,* we would not hesitate to follow *Brown* and *Merrill* because of the possible danger to arresting officers.

14. *See, e. g., United States v. Frick*, 490 F.2d 666 (5th Cir. 1973), *cert. denied sub nom., Peterson v. United States*, 419 U.S. 831, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974); *Pinkney v. United States*, 360 A.2d 35 (D.C.App.1976); *Wood v. State*, 515 S.W.2d 300 (Tex.Cr.App.1974). *But see United States v. Rowan*, 439 F.Supp. 1020 (E.D.Tenn.1977).