Jon W. HOWARD, Appellant,

v.

STATE of Alaska, Appellee.

Grady M. HOWARD, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 6027, 6123.

Court of Appeals of Alaska.

June 10, 1983.

Dennis L. McCarty, Ketchikan, for Appellant Jon W. Howard. Robert Blasco, Asst. Public Defender, Ketchikan, and Dana Fabe, Public Defender, Anchorage, for appellant Grady M. Howard.

Charles M. Merriner, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

OPINION

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

SINGLETON, Judge.

Grady M. Howard entered a plea of *nolo contendere* to two counts of sexual assault in the first degree. AS 11.41.410. Jon W. Howard entered a plea of *nolo contendere* to one count of sexual assault in the second degree. AS 11.41.420. Both Howards entered their pleas reserving a right to appeal orders of the trial courts denying motions to suppress evidence, pursuant to *Oveson v. Anchorage,* 574 P.2d 801 (Alaska 1978), and *Cooksey v. State,* 524 P.2d 1251 (Alaska 1974). We therefore have jurisdiction over this case. In addition, Jon Howard claims that his sentence of eight years with three years suspended was excessive. We affirm both convictions and Jon Howard's sentence.

Grady Howard raped L.J. and E.H. Jon Howard had sexual contact with L.J. without her consent. At the time L.J. was fourteen years old; E.H. was fifteen years old. These incidents occurred on July 10, 1980, in a secluded, heavily-wooded area bordering Ketchikan. During the assault, Grady Howard threatened E.H. with a knife which he drove in the ground near them. E.H. grabbed the knife and stabbed Grady in the back as hard as she could. She said she buried the knife in his back up to the hilt. She then kicked him off and the two girls made their escape and reported the crimes to the police.

The two girls were separately interviewed and gave consistent descriptions of their assailants. They indicated that they thought the two men were brothers. They said that the older man was white, in his late twenties or early thirties, 5'8" to 5'9" tall, with ear-length dark brown hair, curly on the ends, and a three or four-day-old scraggly growth of beard. He had a large nose, a tattoo on his left forearm with red color in it, and was slim with a protruding belly; he was wearing blue jeans and a dark colored fur-lined leather jacket that zipped up the front. They said the older man resembled then Sitka Chief of Police Bill Thorton, but was a bit thinner.

They described the younger man as a white male, eighteen or nineteen years old, 5'6" or 5'7" tall, with light brown or "dishwater" blond hair coming two inches below his ears and slightly curled at the ends. They said he had distinctive eyes, not oriental but kind of slanted, that he was skinny, and wore blue jeans and a dark blue denim jacket with a white, fleece collar and lining, and that he had a scar on the right side of his right eye that looked fresh.

They said both of the men smelled as if they had not bathed for some time. Both had a slight accent which the girls thought could be southern. Finally, E.H. said that she had heard one of the men call the other a name which she thought was "Danny." E.H. said that she had driven the knife blade into the older man's back to the hilt and slightly downward just under his right shoulder blade. She described the knife as having approximately a six-inch, slightly rusted blade. The girls also described a distinctive cowboy hat that the younger man was wearing. They recognized the hat when the police found it at the scene of the assault along with the girls' clothing. The girls also told the police that the older man told them that he had just gotten out of prison for armed robbery.

The assaults were given substantial publicity in the Ketchikan area. A number of people reported seeing persons matching

the general description of the two assailants. The strongest leads came from Frank Trafton, who ran a drop-in center for transients in Ketchikan, and Don Smith, who was employed by Trafton. Trafton and Smith stated that two sets of brothers had stayed at the center and matched the general description given by the victims. They did not remember the names of either pair of brothers. One pair had, however, been in the company of a local resident named Okie Ross. Ross was contacted and told police that these men were the Toler brothers from Georgia. He believed they had left town but stated that they had camped briefly in the Ward Lake Camp area. People at the camp area were contacted and had vague memories of the Toler brothers. Georgia authorities were contacted and it was discovered that Harry Toler, one of the brothers, had a criminal record for burglary. Trafton also told the officers that one pair of brothers, they did not know which, had recently camped in a secluded area near Ketchikan Creek. Finally, Smith identified the hat found at the scene of the rape as having been worn by one of the members of one of the sets of brothers, but he did not know which one. Sergeant Varnell and Officer Mallott of the Ketchikan Police then determined that they would look for the Tolers in the Ketchikan Creek area. Since the area was densely wooded and remote, they asked William Spear, a local resident, to accompany them as a guide and help them find an abandoned mine at the end of a railroad trestle where they thought the Tolers might be camping.

. On July 12, 1980, two days after the assaults, Sergeant Varnell, Officer Mallott and Spear set out along Ketchikan Creek in hopes of locating the Toler brothers. Spear was in the lead and Varnell brought up the rear. After proceeding a distance up the creek, they smelled a campfire. At first they thought they would circle around behind the camp to avoid alarming its occupants, but misjudged the distances and stumbled out of the brush into the camp-site. Spear, who was in the lead saw two men at the camp. One of these men noticed Spear, grabbed a rifle, and ran into the brush. The other was sitting on a log with his back to Spear, drinking coffee. Spear told Mallott and Varnell that he had seen a man run into the brush. Varnell drew his pistol and approached the man seated by the campfire who turned out to be Jon Howard. He was wearing some kind of a raincoat or slicker which covered his clothes. Varnell frisked Jon Howard at gunpoint, handcuffed him, and ordered him to sit on the log. Varnell then noticed that Jon Howard was wearing a blue denim jacket with a fleece collar. He also noticed that a leather jacket, similar to the one described by the victims, was lying under a nearby tarp.

In the meantime, Spear and Officer Mallott searched the surrounding woods for the second man, who was later identified as Grady Howard. They found him hiding beside a fallen tree with an unloaded .22-caliber rifle lying beside him. Mallott drew his pistol, pointed it at Grady, and ordered him to put his hands on a tree. Mallott then frisked Grady, handcuffed him behind his back and took him back to the clearing to join his brother. In the course of the frisk, Mallott seized a knife from a sheath on Grady's belt. The knife matched exactly the description given by the girls. The two men were given Miranda[1] warnings after Spear and Mallott returned to the clearing with Grady Howard. The officers observed the two Howards and for the first time concluded that they matched the physical descriptions given by the victims. Varnell asked Jon Howard if he owned a cowboy hat similar to the one described by the girls and found at the rape scene. Jon Howard admitted that he did, but said that it had been stolen two or three days before. Varnell asked the Howards for their names and was told that the younger man was Jon Howard and the older was Grady Howard. Varnell, believing that they were the Tol-

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Neither Howard complains of a *Miranda* violation.

ers, accused the Howards of lying. The Howards, who were handcuffed, told Varnell they had identification in their wallets. Varnell examined the driver's licenses which identified the two men as, respectively, Danny and Jon Howard. Grady, who was a fugitive from Oregon on an armed robbery conviction, had been using his older brother Danny's driver's license for identification. He did not mention this impersonation to Sergeant Varnell, but merely suggested that "Grady" was a nickname. Varnell made a mental note that one of the girls had indicated that one of their assailants was called "Danny."

Varnell asked Grady if he had a back wound. Grady admitted that he did, suggesting that he had been scraped by a tree branch a few days earlier. Varnell asked Grady if he could look at his back and Grady consented. Varnell raised Grady's shirt and observed two bandages in an "X" pattern on Grady's back. Varnell probed the wound in hopes of determining whether the wound was as deep as the victim had described it, or was merely a scrape as suggested by Grady. When Grady did not show signs of discomfort, Varnell lowered Grady's shirt. A few moments later, after talking to the Howards, Varnell asked Grady if he could remove the bandages. Again, Grady did not object and when Varnell removed the bandages, he saw that Grady had sustained a substantial wound and not merely a scrape. At this point, Sergeant Varnell advised the Howards that they were under arrest. The brothers were taken to the police station where both girls positively identified them from photographic lineups. Jon Howard later made a full confession.

## WERE THE HOWARD'S ILLEGALLY ARRESTED?

The Howards concede that by the time of their formal arrest the police had probable cause to arrest them. The police knew that they matched the physical description and wore clothes similar to those described by the victims. Moreover, Jon Howard admitted owning a similar hat, while Grady How-ard conceded having a similar wound. *See Uptegraft v. State,* 621 P.2d 5, 9–10 (Alaska 1980). Nevertheless, the Howards argue that at the time they were actually arrested, the police had not verified this information and therefore did not have probable cause to arrest them. Thus, the primary legal issue presented by this appeal requires us to determine the time at which the Howards were arrested. The Howards contend that they were arrested at the point when they were confronted with loaded guns and were handcuffed. The state concedes that probable cause was lacking if this contention is correct, so that all of the fruits of the arrest, *i.e.,* the statements made by the Howards, police observation of Grady Howard's wound, and Jon Howard's subsequent confession, must be suppressed. However, the state argues that police detention of the Howards at gunpoint despite their handcuffing the Howards, amounted to an investigatory stop, based upon reasonable suspicion, and that the arrest did not occur until the on-the-scene investigation was completed approximately twenty minutes after the Howards were first accosted by the police.

The Howards were separately indicted and tried for these crimes. Jon Howard's case was assigned to Judge (now Justice) Allen Compton while Grady Howard's case was assigned to Judge Thomas Schulz. With the consent of the parties, Judges Compton and Schulz held a joint suppression hearing at which evidence was presented regarding the arrest of the Howards. The judges agreed that no evidence should be suppressed because of the timing of the arrest. Essentially, both judges concluded that the police had probable cause to arrest the Howards shortly after observing them in the clearing. Judge Schulz specifically found that the police, by accosting the Howards with guns drawn and immediately handcuffing them, had made an arrest and not an investigatory stop. Judge Compton thought it was a close issue and leaned towards finding an investigatory stop, but concluded that it was not necessary to make the distinction because he agreed with Judge Schulz that in any event the police had probable cause at the time they entered the clearing.

The Howards argue that the trial judges findings of probable cause were clearly erroneous. They point out that each judge seems to have assumed that the police had an opportunity to compare the Howards with the descriptions given by the victims before the Howards were handcuffed, the point at which the Howards contend the arrest occurred. They argue vigorously that the record would not support such a finding and that in fact they were accosted and handcuffed before any effort was made to determine whether they matched the description previously given. Before deciding whether police contact with the Howards constituted an investigatory detention or an arrest and, consequently, whether reasonable suspicion or probable cause is the appropriate test in the cases under consideration, it is necessary to briefly consider recent developments in the law of arrest.

■ There are essentially three types of contact between the police and private citizens which have received attention in the reported cases: (1) A generalized request for information, for example, questions put to bystanders during an on-the-scene investigation of a crime. *See Palmer v. State,* 604 P.2d 1106, 1112 (Alaska 1979) (Rabinowitz, C.J., concurring); Model Code of Pre-Arraignment Procedure § 110.1 (1975) [Hereinafter cited as MC § _____]. (2) An investigatory stop, supported by articulable suspicion that a person has committed or is about to commit a crime. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Coleman v. State,* 553 P.2d 40 (Alaska 1976); *Metzker v. State,* 658 P.2d 147 (Alaska App.1983); *see* MC § 110.2. (3) Finally, an arrest, based upon facts and circumstances which would lead a prudent person to believe that a crime had been committed and that the person arrested had committed it. *Schmid v. State,* 615 P.2d 565, 574 (Alaska 1980).

■ The factor which distinguishes an on-the-scene investigation from an investigatory stop or arrest is that the person encountered "on the scene" is under no obligation to remain, may decline to listen to any questions, and may go on his way.

*Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *Henry v. State,* 621 P.2d 1 (Alaska 1980). An inquiry of someone at the scene is not necessarily a fourth amendment seizure. An investigatory stop and an arrest are fourth amendment seizures. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Henry v. State,* 621 P.2d at 3.

■ The line between an investigatory stop and a full arrest is less clear, but seems to turn on the duration and intrusiveness of the restraint. In *Florida v. Royer,* the Supreme Court said:

We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answer to the question whether there has been an unreasonable search and seizure in violation of the Fourth Amendment . . . .

—— U.S. at ——, 103 S.Ct. at 1329, 75 L.Ed.2d at 242.

■ The Alaska Supreme Court has placed additional restrictions on the use of investigatory stops in this jurisdiction. *See Coleman v. State,* 553 P.2d 40, 46 (Alaska 1976) (temporary detention only permitted for questioning where the police officer has a reasonable suspicion that imminent public danger exists or serious harm to persons or property has recently occurred).

The Howards argue that there is a further restriction on investigatory stops in Alaska. They contend that a forcible seizure at gunpoint followed by immediate handcuffing constitutes an arrest requiring probable cause. They rely on *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), *United States v. Ramos-Zaragosa,* 516 F.2d 141, 144 (9th Cir.1975), and *United States v. Strickler,* 490 F.2d 378, 380 (9th Cir.1974), and contend that the rule

of these cases was adopted in *Nome v. Ailak,* 570 P.2d 162 (Alaska 1977), and *Richardson v. State,* 563 P.2d 266 (Alaska 1977). The Howards contend that these latter cases stand for the proposition that any show of force creating an actual restraint or submission to authority constitutes an arrest, not a stop, under AS 12.25.050 and AS 12.25.160, which provide:

Sec. 12.25.050. *Method of making arrest.* An arrest is made by the actual restraint of a person or by his submission to the custody of the person making the arrest. Sec. 12.25.160. *Arrest defined.* Arrest is the taking of a person into custody in order that he may be held to answer for the commission of a crime.

The state counters that drawn guns and handcuffing, standing alone, do not convert an investigatory stop into an arrest and that a reasonable suspicion that the person stopped has engaged in a crime of violence and is armed and dangerous justifies drawn guns and handcuffs without turning an investigatory stop into an arrest. The Model Code of Pre-Arraignment Procedure is in agreement with the state's position. MC § 110.2(3). The state argues that *Henry v. United States* has been substantially undercut by *Terry v. Ohio,* and that *Ramos-Zaragosa* and *Strickler* clearly represent a minority view. *See* 3 W. LaFave, *Search and Seizure* § 9.2(d), at 28–33 (1978). Finally, the state contends that the broad language of AS 12.25.050 is qualified by AS 12.25.160 and was further modified by the legislature's enactment of AS 11.81.370, which specifically authorizes a peace officer to use nondeadly force and threaten to use deadly force to the extent necessary in making a lawful stop. The state's view of this statute appears to be supported by the legislative comment accompanying its enactment:

Subsection (a) provides that a peace officer may use nondeadly force and may threaten to use deadly force whenever he reasonably believes it necessary to make an arrest, to terminate an escape or attempted escape from custody, or to make a lawful stop. In providing that nondeadly force may be used to effect a lawful stop, the Code insures that a peace

officer will not be criminally liable for an assault prosecution for conducting a lawful stop of the kind described in *Coleman v. State,* 553 P.2d 40, 46 (Alaska 1976).

2 Senate Journal, Supp. No. 47, at 129–31 (June 12, 1978); *and see* Alaska Criminal Code Revision Part II, 59–62 (Tent. Draft 1977), where the drafters say:

Further, in providing that physical force may be used to effect a lawful stop, subsection (a) insures that a peace officer will not be criminally liable for an assault prosecution for conducting a lawful search for weapons of the kind described in *Terry v. Ohio,* 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968) when the use of physical force is necessary to accomplish this limited type of search. If in conducting this search, sufficient probable cause is established to warrant an arrest, the continued use of physical force will be justified if necessary to effectuate that arrest.

█ AS 11.81.370 therefore supports the state's theory that a show of force followed by temporary restraint and submission to custody does not necessarily turn a stop into an arrest. AS 12.25.160 supports the state's theory that a person is not arrested until he is "held to answer for the commission of a crime." We, therefore, conclude that drawn guns and handcuffing do not necessarily turn a stop into an arrest. Recognizing the uncertainties that still exist in the law regarding distinguishing between lawful stops and custodial arrest, we believe the following factors serve to distinguish them.

█ First, the court must consider the purpose for the stop and, specifically, the kind of criminal activity being investigated. In Alaska investigatory stops are limited to the investigation of crimes of violence or crimes involving serious and substantial loss to property. Second, the stop must be for a limited and specific inquiry, *i.e.,* the police must be diligently pursuing a means of investigation which is soon likely to resolve the matter one way or the other. Once the inquiry is completed the person detained

must be freed or arrested. *See* 3 W. La-Fave, *supra* § 9.2(f), at 40. Third, the stop must be of brief duration; the exact length will depend in part upon what is learned by the police relating to their initial suspicions. As one court pointed out:

> The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.

*State v. Watson,* 165 Conn. 577, 345 A.2d 532, 537 (Conn.1973). Fourth, the stop must not require the person stopped to travel an appreciable distance. Fifth, the force used in effectuating the stop must be proportional to the risk reasonably foreseen by the officer at the time he makes the stop. *Cf.* AS 12.25.070 (no peace officer or private person may subject a person arrested to greater restraint than is necessary and proper for his arrest and detention).

This last factor is very important since stops frequently precede searches which are defended on the basis of "consent." *See Henry v. State,* 621 P.2d 1, 4 (Alaska 1980). Many courts have expressed concern that a stop not be permitted to become a pretext for a search, since a show of force might intimidate the person stopped into giving consent to the subsequent search. On the other hand, if Alaska limits investigatory stops to situations creating a great risk of violence, then it would seem counterproductive to preclude an investigatory stop wherever the police must make a show of force in order to effectuate the stop. As Professor LaFave points out:

> The better view, then, is that an otherwise valid stop is not inevitably rendered unreasonable merely because the suspect's car was boxed in by police cars in order to prevent it from [being] moved. Likewise, it cannot be said that whenever police draw weapons the resulting seizure must be deemed an arrest rather than a stop and thus may be upheld only if full probable cause was then present. The courts have rather consistently upheld such police conduct when the circumstances (*e.g.,* suspicion that the occupants of a car are the persons who just committed an armed robbery) indicated that it was a reasonable precaution for the protection and safety of the investigating officers.
>
> This is not to suggest that in the course of stopping suspects for investigation the police may, as a matter of routine, utilize modes of restraint which might commonly be employed incident to arrest. For example, though it may be unobjectionable to lock an arrested person in a squad car pending arrival of a squadrol [*sic*] to transport him to the station, it cannot be said that such action would ordinarily be a permissible part of stopping for investigation. Nor can it be said that such action would *never* be permissible, for there may be unique circumstances in which such confinement is reasonably related to the investigative activity, as illustrated by *United States v. Lee* [372 F.Supp. 591 (W.D.Pa.1974)]. There, a single officer reported to a bank on a day when large amounts of cash would be in the bank and transported from the bank to meet local payrolls, and learned that for some time two men had been loitering near the bank under highly suspicious circumstances. When the officer approached the men, one of them fled, so he seized the remaining suspect and locked him in the back of the police cruiser while he pursued the other man. The court quite correctly concluded that this action was reasonable under the circumstances because it was "reasonably calculated to maintain the status quo" while an effort was made to seize the other suspect. Similarly, handcuffing of the suspect is not ordinarily proper, but yet may be resorted to when necessary to thwart the suspect's attempt to "frustrate further inquiry." [Citing *United States v. Purry,* 545 F.2d 217 (D.C.Cir.1976).]

3 W. LaFave, *supra* § 9.2(d), at 30–31 (emphasis in original).

■ We have evaluated the totality of the circumstances facing the officers as they first stumbled into the Howards' camp. In light of these factors, we are satisfied that both Varnell's initial contact with Jon Howard, at gunpoint, resulting in Jon Howard's being handcuffed and placed on a log, and Officer Mallott's initial contact with Grady Howard, resulting in Grady Howard being handcuffed and returned to the clearing, constituted investigatory stops and not arrests. First, the victims' statements provided probable cause to believe first-degree sexual assault had been committed two days prior to the officers encounter with the Howards. Sexual assault is a serious crime of violence. Second, the officers restrained the Howards for the limited purpose of maintaining the status quo while they checked the Howards' appearance against the description furnished by the victims, asked Jon Howard about the cowboy hat found at the scene of the incident, and questioned Grady Howard about the wound allegedly suffered by the older assailant during the course of the assault. Third, the detention was limited as to place. Jon Howard was detained at the campsite where he was found, while Grady Howard was returned to that campsite. Fourth, the stop was limited as to duration. The entire encounter between the officers and the Howards lasted less than twenty minutes. Fifth and finally, the amount of force used was proportional to the risk reasonably to be foreseen by the officers. The encounter took place in a heavily wooded area. The officers could not be sure that the Howards did not have allies hidden in the brush. The persons being sought were wanted for a serious crime of violence, were known to be armed, and the older assailant had told the victims that he was an escaped, armed robbery. When the officers entered the clearing, the person later identified as Grady Howard ran away carrying a .22 rifle. There were two known suspects and only two officers, Mr. Spear having come along only as a guide. Under these circumstances, it was not unreasonable to maintain the status quo by handcuffing the Howards until they could be brought together in the clearing and compared with the descriptions given by the victims of the assault.

We are satisfied that the officers had an articulable suspicion justifying an investigatory stop when they entered the clearing. Prior information warranted their belief that the assailants might be camped along Ketchikan Creek. This information, coupled with their discovery of the two men, one of whom fled upon contact, warranted a brief investigatory stop to permit the officers to compare the two men detained with the men described by the victims.

It is undisputed that the Howards matched the description given by the victims. It is also undisputed that Jon Howard was wearing the blue denim jacket with the fleece collar, as described by the victims, under his slicker, and that a leather jacket similar to the one described by L.J. was observed by Varnell under the tarp. After they were given *Miranda* warnings, Jon Howard conceded that he owned a hat similar to the one found at the scene of the rape but alleged that it was stolen two or three days before. Grady Howard acknowledged that he had a wound on his back. The Howards' physical appearance, coupled with the answers they gave to these questions, would warrant belief by reasonably prudent people that the Howards were the men who had sexually assaulted L.J. and E.H. The trial court did not err in failing to suppress evidence that was the fruit of the Howards' subsequent arrest.

■ This decision disposes of Grady Howard's appeal. Jon Howard, in addition, challenges his sentence. Jon Howard pled *nolo contendere* to sexual assault in the second degree, a class B felony. AS 11.41.-420. A person convicted of a class B felony may be sentenced to a definite term of imprisonment of not more than ten years. The presumptive terms for second and third offenders are respectively four and six years. AS 12.55.125(d). Judge Lewis sentenced Jon Howard to serve eight years with three years suspended. Since Jon Howard was a first felony offender, Judge Lewis carefully considered the sentencing criteria established in AS 12.55.005. Be-

cause the defendant argued that mitigating factors existed and the prosecutor argued that Jon Howard should receive a sentence in excess of the presumptive sentence for a second felony offender, Judge Lewis also carefully considered the aggravating and mitigating factors established in AS 12.55.-155. He concluded that Joh Howard's conduct was among the most serious conduct included in the definition of the offense of second-degree sexual assault. *See* AS 12.-55.155(c)(10). This conclusion was based on a number of factors. Judge Lewis found that: (1) the assault was, to a certain extent, premeditated between Grady and Jon Howard, that is, that they had discussed "forcible seduction" of some stranger before encountering the victims of this offense; (2) Jon Howard's "sexual contact" closely approximated "sexual penetration" which would have made the crime first-degree sexual assault; (3) Grady Howard used a knife to subdue the victims without any protest by Jon Howard; (4) Jon Howard actively assisted Grady in subjugating the two victims. Judge Lewis found some mitigating factors, including Jon Howard's youth, his being a follower rather than the leader and his being substantially influenced by his older brother, the fact that his judgment was to some degree impaired by alcohol, and his cooperation with the authorities. Taking all of these factors together, the trial court imposed a sentence of eight years with three years suspended. Given the nature of the crime and the background of the defendant, this sentence was not clearly mistaken. *See McClain v. State,* 519 P.2d 811 (Alaska 1974).

The judgments of the superior court are AFFIRMED.