Ron D. ROMO, Appellant,

v.

**MUNICIPALITY OF ANCHORAGE, Appellee.**

No. A–462.

Court of Appeals of Alaska.

April 12, 1985.

Marvin H. Clark, Jr., Ross, Gingras & Frenz, Anchorage, for appellant.

Dennis P. Cummings, Asst. Municipal Prosecutor, Allen M. Bailey, Municipal Prosecutor, and Jerry Wertzbaugher, Municipal Atty., Anchorage, for appellee.

Before BRYNER, C.J., SINGLETON, J., and BUCKALEW, Superior Court Judge.[*]

OPINION

SINGLETON, Judge.

Ron D. Romo pled *nolo contendere* and was convicted of refusal to submit to a chemical breath test for alcohol. AMC 9.28.022(C). With the consent of the prosecutor and the court, Romo reserved his right to appeal three issues to this court: (1) that his arrest resulted from an illegal investigatory stop, precluding use in evidence of his refusal to submit to a breathalyzer examination; (2) that Anchorage Municipal Code § 9.28.021 (implied consent to a chemical test) is unconstitutionally vague; and (3) that he was denied the right to

---

[*] Buckalew, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

counsel after his arrest when he requested to talk to his lawyer a second time before deciding whether to take the breathalyzer test. We therefore have jurisdiction of this appeal. *See Oveson v. Anchorage*, 574 P.2d 801 (Alaska 1978); *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974). Having reviewed the record and the arguments of the parties, we find no error and affirm the judgment of the district court.

## FACTS

In the early morning of January 8, 1984, Officer Plummer of the Anchorage Drunk Detection Team observed Romo in a pickup truck at an intersection in downtown Anchorage. Officer Plummer recognized a passenger in the cab of the truck as a prostitute. He followed the truck for several blocks. Officer Plummer wrote in his report that "[d]uring this time the vehicle used its signals when changing lanes and came to complete stops at the red lights." Officer Plummer testified that he saw no indication from Romo's driving that he was intoxicated.

Romo pulled into a plowed-out area in the parking lot, stopped, turned out his lights, and sat for a moment. Officer Plummer also stopped his car about forty to fifty feet behind the truck. He did not activate his emergency lights or make any attempt to contact Romo. Romo then got out of his truck and approached Officer Plummer, who then also got out of his car. At this point, Officer Plummer noticed an "odor of alcoholic beverage about his [Romo's] person." Officer Plummer asked Romo if he had been drinking and Romo replied that he had. Officer Plummer then asked for Romo's driver's license, which Romo gave him. Then Officer Plummer asked Romo to perform field sobriety tests, which he failed. Officer Plummer then placed Romo under arrest for driving while intoxicated. The arrest occurred at approximately 2:48 a.m.

Officer Plummer transported Romo to the police station and turned Romo over to Officer Schwartz, who conducted breathalyzer examinations, at 3:09 a.m. According to Officer Schwartz' notes, Romo requested to speak with his attorney for the first time at 3:33 a.m. Romo indicated that he had a personal attorney who was out of town. At Officer Schwartz' suggestion, Romo agreed to talk to a public defender, who was called and spoke with Romo on the phone. Neither Romo nor the public defender testified at the hearing; consequently, it is not clear what they discussed. After the call, however, Romo refused to take the breathalyzer test. He was then placed on videotape at 3:53 a.m.

During the videotape, Officer Schwartz read Romo the implied consent warning, informing him of how the breathalyzer test is given and of the consequences of refusing to take the test. Apparently, Romo appeared startled when he learned that refusing to take the test was a crime for which he could be punished. He then requested to speak with an attorney a second time. Officer Schwartz refused this request, saying that Romo could not delay the test. Romo continued to refuse to take the test; he also refused to sign a copy of the statement which Officer Schwartz had read to him.

## DISCUSSION

### I. Investigatory Stop

District Court Judge Natalie K. Finn found that Officer Plummer's contact with Romo did not become an "investigatory stop" until Romo was asked to perform field sobriety tests. Romo challenges this finding on appeal. He argues that Officer Plummer's surveillance made Romo apprehensive and caused him to stop his vehicle and contact the officer. Under these circumstances, Romo argues he was effectively in custody from the time he exited his vehicle.

There are essentially three types of contact between the police and private citizens which have received attention in the reported cases: (1) a generalized request for information, for example in an on-the-scene investigation of a crime; (2) an investigatory stop supported by articulable

suspicion that a person has committed or is about to commit a crime; and (3) an arrest based upon facts and circumstances which would lead a reasonable person to believe that a crime has been committed and that the person arrested committed it. *Howard v. State,* 664 P.2d 603, 608 (Alaska App. 1983). General questions put to a person, even a suspect at the scene of a crime, do not constitute a fourth amendment seizure. *See Palmer v. State,* 604 P.2d 1106, 1111–13 (Alaska 1979) (Rabinowitz, C.J., concurring) (person subject to on-the-scene investigation not in custody). Conversely, an investigatory stop and, *a fortiori,* an arrest do constitute fourth amendment seizures. A fourth amendment seizure, which depending on other circumstances may be either an investigative stop or a full arrest, exists "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Waring v. State,* 670 P.2d 357, 363 (Alaska 1983), *quoting Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889, 905 n. 16 (1968). The term "physical force" is self-explanatory. The court in *Waring* recognized, however, that the term "show of authority" is somewhat ambiguous. In reliance on federal law, *Waring* defined "show of authority" as a circumstance under which a reasonable person, in view of the objective facts surrounding the incident, would believe that he is not free to leave. The court recognized that anyone encountering a police officer might feel an obligation to respond to the officer's questions and not walk away. Such feelings did not constitute restraint, the court reasoned. Rather,

> [s]uch a confrontation, therefore, will amount to a seizure "only if the officer added to those inherent pressures [from being accosted by an officer] by engaging in" "conduct which a reasonable man would view as threatening or offensive even if coming from another private citizen." 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.2, at 53, 54 (1978) (footnote omitted). "[T]he critical inquiry would be whether the policeman, although per-

haps making inquiries which a private citizen would not be expected to make, has otherwise conducted himself in a manner consistent with what would be viewed as a nonoffensive contact if it occurred between two ordinary citizens." *Id.* (footnote omitted).

*Waring,* 670 P.2d at 364 (footnote omitted).

Whenever a reasonable person would believe that his attempt to break off discussion with the officer and leave the scene would result in actual restraint or other physical violence, he is restrained and has been seized as the term is used in the constitution. While the *Waring* court does not make the point, it should be emphasized that the "reasonable person" whose perceptions are under consideration is one who is innocent of any crime. A person who considers himself guilty of some offense probably labors under a number of psychological disadvantages and would tend to treat any action, however harmless or innocuous, by a police officer as threatening. It has been said that "the guilty flee where none pursue." Thus, the test becomes whether a reasonably prudent person who is innocent of any crime would treat the police officer's actions as indicating an intent to restrain or confine the person, considering all the circumstances. It is important to stress that the controlling factor is what a reasonable person would perceive the officer's intentions to be, based upon the officer's words and actions, rather than what in fact the officer's intentions were.

Keeping the legal test of *Waring* in mind, we are satisfied that the trial court was not clearly erroneous in finding that no fourth amendment seizure occurred at the point when Romo exited his vehicle and Officer Plummer asked him if he had been drinking. *See Waring,* 670 P.2d at 364 and n. 15. Romo stopped his vehicle of his own accord and he himself approached the officer who, though he had also stopped his car, had made no attempt to contact Romo. We believe that a reasonable person in Romo's position would therefore have felt free to refuse to answer the officer's question.

■ We are further satisfied that the officer had sufficient reasonable suspicion to justify his subsequent request that Romo perform field sobriety tests. In *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976), the Alaska Supreme Court held that temporary detention is justified in "cases where the police officer has a reasonable suspicion that imminent public danger exists." In *State v. Moran*, 667 P.2d 734, 735–36 (Alaska App.1983), this court discussed the quantum of information that an officer must have to justify a stop. Noting that the concept is necessarily somewhat vague, we quoted *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 628–29 (1981), in which the Supreme Court said, "[b]ased upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."

In this case, when Officer Plummer requested that Romo perform field sobriety tests, Officer Plummer had made the following observations: (1) he had seen Romo driving for several blocks with no visible sign of intoxication; (2) he had smelled alcohol on Romo; (3) he had spoken to Romo and heard him admit that he had been drinking. Based on this evidence, we believe that Officer Plummer had a particularized and objective basis for his suspicion and could reasonably have surmised that Romo may have been driving while intoxicated. Under these circumstances, we hold that the trial court was not in error in concluding that Officer Plummer was justified in performing an investigatory stop for the purpose of administering field sobriety tests.[1]

■ Romo also argues that since he had stopped his car in his apartment parking lot and exited his car, Officer Plummer could not reasonably have believed, as required by *Coleman*, that "imminent public danger" existed any longer from Romo's driving. *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976). In *Larson v. State*, 669 P.2d 1334 (Alaska App.1983), in a somewhat similar situation, the defendant argued that no imminent public danger existed to justify a stop because a police officer had seen Larson slide into the passenger side of the car and another person begin driving. We upheld the trial court's finding that "it was likely that Larson would have resumed driving at some later point, and that [the officer] was not unreasonable in believing that the change of drivers did not eliminate the need for an investigatory stop." *Larson*, 669 P.2d at 1337. In the instant case, Judge Finn made no specific finding as to the likelihood of Romo's driving again or the reasonableness of Officer Plummer's belief of imminent public danger. We are satisfied as a matter of law that an investigatory stop was proper in this case. The fact that Romo was driving just prior to his encounter with Officer Plummer demonstrated Romo's willingness to drive in his current condition. At the time of the encounter, Romo retained possession of his car and it remained immediately accessible for him to drive. Under these circumstances there was a sufficient

---

1. We have found a few cases from other jurisdictions holding that a smell of alcohol standing alone is insufficient to establish probable cause to arrest a suspect for driving while intoxicated. *People v. Roybal*, 655 P.2d 410 (Colo.1982); *State v. Taylor*, 3 Ohio App.3d 197, 444 N.E.2d 481 (1981); *see also State v. Johnson*, 215 Neb. 391, 338 N.W.2d 769 (1983) (mere odor of alcohol cannot form only basis for witness' testimony that a driver was intoxicated). We believe that these cases are distinguishable. First of all, we are not speaking here of probable cause to arrest, but only reasonable suspicion to investigate. The standards are quite different. *See Howard v. State*, 664 P.2d 603, 608 (Alaska App. 1983); *State v. Moran*, 667 P.2d at 735. More importantly, the offense of driving with a blood-alcohol level of .10 differs substantially from an offense which requires proof that a driver's ability to control his vehicle was in fact impaired, *i.e.*, a statute that requires proof of erratic driving. And this is so even if the impaired driving statute permits an inference of DWI where the state proves a .10 blood level, the case in Colorado and Ohio. The legislature in enacting the .10 statutes clearly found that people who have consumed sufficient alcohol, but do not necessarily manifest impairment in their driving, are nevertheless substantially dangerous. *See, e.g., State v. Johnson*, 42 N.J. 146, 199 A.2d 809, 822 (1964).

risk of imminent public danger to warrant an investigatory stop.[2]

## II. Vagueness of AMC 9.28.021

Romo next contends that the municipality's Implied Consent ordinance is unconstitutionally vague. *See* AMC 9.28.021.[3] He argues that its plain meaning is that a person is deemed to have consented to a chemical test if the person is arrested for committing some offense other than DWI, while *also* committing DWI at the same time. The first sentence of subsection (A) of the ordinance provides that a person who operates a motor vehicle within the municipality is considered to have given consent to a chemical test

> if lawfully arrested for an offense arising out of acts alleged to have been committed while the person was operating, driving, or in actual control of a motor vehicle ... while intoxicated.

This language is virtually identical to that of the state Implied Consent statute, AS 28.35.031.

■ We are satisfied that the plain meaning of the ordinance is that any person lawfully arrested for driving while intoxicated or for any other crime in which evidence that the defendant was driving while intoxicated would play an important part in establishing the *actus reus* of the offense, *e.g.*, motor vehicle assaults or homicides, *see Pears v. State*, 672 P.2d 903 (Alaska App.1983), *petition for hearing granted* (Alaska, January 23, 1984) (on issue of excessiveness of sentence only), is

deemed to have consented to a chemical test. The statute, as interpreted, is therefore not unconstitutionally vague. *See Colautti v. Franklin*, 439 U.S. 379, 390, 99 S.Ct. 675, 683, 58 L.Ed.2d 596, 606 (1979); *Summers v. Anchorage*, 589 P.2d 863, 866–67 (Alaska 1979).

## III. Right to Counsel

■ Finally, Romo appeals Judge Finn's ruling that he was not denied his constitutional and statutory right to counsel when the police refused his request for a second call to an attorney before deciding whether to take the breathalyzer test.

Romo was arrested at 2:48 a.m. and turned over to Officer Schwartz at the police station at 3:09 a.m. He requested to call an attorney at 3:33 a.m. and spoke with a member of the staff at the Public Defender Agency at 3:35 a.m. After the call, Romo refused to take the breathalyzer and was videotaped from approximately 3:53 to 4:10 a.m. At this time he was informed of the legal consequences of refusing the test. He requested to speak with his attorney a second time, but the request was refused. He again refused to take the breathalyzer test.

In *Copelin v. State*, 659 P.2d 1206 (Alaska 1983), the Alaska Supreme Court held that a DWI suspect has a right under AS 12.25.150(b) and Alaska Criminal Rule 5(b) to consult with counsel before being required to decide whether or not to submit to a breathalyzer test. 659 P.2d at 1208.

---

**2.** Our resolution of this issue makes it unnecessary for us to determine whether driving while intoxicated is a sufficiently serious crime, *i.e.*, one causing serious harm to persons or property, to justify an investigatory stop without regard to any determination that the driver stopped would drive in the future. *See Coleman*, 553 P.2d at 46.

**3.** Anchorage Municipal Code § 9.28.021 states in relevant part:

*Implied consent.*
A. A person who operates, drives or is in actual physical control of a motor vehicle within the municipality or who operates an aircraft as defined by AMC 9.28.020E.1 or who operates a watercraft as defined by AMC

9.28.020E.2 shall be considered to have given consent to a chemical test or tests of his or her breath for the purpose of determining the alcoholic content of his or her blood or breath if lawfully arrested for an offense arising out of acts alleged to have been committed while the person was operating, driving or in actual physical control of a motor vehicle or operating an aircraft or a watercraft while intoxicated. The test or tests shall be administered at the direction of a law enforcement officer who has reasonable ground to believe that the person was operating, driving, or in actual physical control of a motor vehicle or operating an aircraft or a watercraft in the municipality while intoxicated.

The court recognized that there is a potential tension between the right to the assistance of counsel and the need to preserve accurate evidence, noting that the alcohol concentration in an arrestee's blood will dissipate with time. However, the court noted that Alaska procedure required that the subject be observed by the test operator for at least fifteen minutes before testing, under former 7 AAC § 30.020. 659 P.2d at 1211. This has been changed to twenty minutes. 7 AAC § 30.020(b)(2). The court said, "Since a minimum of a 15 minute wait is necessary before administering the breathalyzer test, no additional delay is incurred by acceding to a request to contact an attorney during that time." 659 P.2d at 1211. In a footnote, the court noted that an arrestee will have a longer period of time in which to contact his attorney when the test operator is not yet ready to administer the test. *Id.* at 1211 n. 13. The court went on to say that the right to contact an attorney is "not an absolute one (which might involve a delay long enough to impair testing results), but, rather, a limited one of reasonable time and opportunity that can be reconciled with the implied consent statutes." *Id.* at 1211–12 (footnote omitted). The court also said that the burden of proof is on the government to show that an accused demanded an unreasonable amount of time, thereby interfering with the "prompt and purposeful investigation" of the case. *Id.* at 1212 n. 14, *quoting Blue v. State*, 558 P.2d 636, 642 (Alaska 1977).

At the hearing, Officer Schwartz testified that under police policy, a DWI suspect is given a reasonable time, about twenty minutes, to contact an attorney. If one cannot be contacted within this time, the suspect must make the decision whether to take the breathalyzer test on his own. According to Officer Schwartz, the twenty-minute period in this case began at 3:09 a.m., when Romo was first placed under his observation. Romo requested, and was allowed, to contact an attorney at 3:33 a.m. By the time he requested to speak with his attorney a second time, at least forty minutes had gone by since the observation period began, so it had been exceeded by at least twenty more minutes. When asked if an additional five-minute phone call would have constituted an unreasonable delay, Officer Schwartz testified that though he could not remember the exact situation on that morning, he usually allows the suspect to make a second call if it is reasonable under the circumstances without putting delay into the process. He speculated that at that time, early on a Sunday morning, there were probably several DWI suspects awaiting the breathalyzer, and further delay might have been unreasonable under those circumstances.

After viewing the video and hearing Officer Schwartz' testimony, Judge Finn denied Romo's motion. She stated in a written opinion that under the circumstances of this case, Officer Schwartz' conduct in denying Romo a second opportunity to speak with an attorney was not unreasonable. Romo argues on appeal that this finding does not satisfy *Copelin*, as the finding must be that granting Romo's request would have caused unreasonable delay. However, it is clear from the wording of her opinion that Judge Finn was aware of the requirements of *Copelin* and found that they were not violated by Officer Schwartz' conduct. Her decision is not erroneous.

To us the important consideration is that Romo had been given a reasonable opportunity to contact an attorney and had spoken with one. Thus, the terms of *Copelin* were satisfied. We do not read *Copelin* as holding that the government is obligated to shoulder the burden of showing that it was not unreasonable in denying a party who had an opportunity to consult with counsel, and who terminated the conversation, an opportunity to delay the administration of the breathalyzer examination for further consultation. We therefore uphold the decision of the trial court. *Municipality of Anchorage v. Marrs*, 694 P.2d 1163, 1166 (Alaska App.1985).

Romo also argues that he was denied his constitutional right to counsel. In *Svedlund v. Anchorage*, 671 P.2d 378, 382

(Alaska App.1983), we held that the breathalyzer exam is not a "critical stage" at which the constitution requires counsel's presence. Romo argues that *Svedlund* does not apply here because he is not arguing that he wanted to have his attorney present at the test, but that he wanted to speak to his attorney a second time before taking the test. We are satisfied that *Svedlund* covers this situation as well. Romo had no constitutional right to contact counsel either by telephone or in person. His sole rights were those granted to him by statute and court rule. We are satisfied that he received the protections to which he was entitled.

The judgment of the district court is AFFIRMED.