Daniel P. **SHEARER**, Appellant,

v.

**MUNICIPALITY OF ANCHORAGE,**
Appellee.

No. A–7467.

Court of Appeals of Alaska.

June 23, 2000.

---

Brent R. Cole, Anchorage, for Appellant.

Carmen E. ClarkWeeks, Assistant Municipal Prosecutor, and Mary K. Hughes, Municipal Attorney, Anchorage, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

COATS, Chief Judge.

Daniel Shearer was charged with one count of driving while intoxicated (DWI).[1] Shearer moved to suppress evidence on the grounds that an off-duty police officer's encounter with Shearer in his driveway constituted an invalid investigatory stop. After District Court Judge Sigurd E. Murphy denied the motion, Shearer pled no contest to, and was found guilty of, DWI.[2] Shearer appeals, claiming that Judge Murphy erred in denying the motion to suppress evidence. We affirm.

1. AMC 9.28.020.

2. Shearer preserved for appeal, pursuant to *Cooksey v. State*, 524 P.2d 1251 (Alaska 1974), the

On January 20, 1999, just after midnight, Anchorage Police Officer Anthony Provost was driving toward the northbound Glenn Highway exit on Muldoon Road when he observed a black Jeep Cherokee pull out of a strip mall and partially obstruct the oncoming lane of traffic. Provost did not attempt to stop the Jeep because he was already committed to the Glenn Highway. Provost had just finished his shift and was on his way home to Eagle River. He was driving an unmarked Ford Aerostar van.

Provost was driving in the right hand lane on the Glenn Highway when he noticed a vehicle similar to the Jeep he had just seen pass him in the left lane at a "high rate of speed." Provost then observed the Jeep slow down to a speed of 55 miles per hour as it approached two other vehicles. The Jeep pulled over to the right hand lane and passed those vehicles. Provost testified that he watched the Jeep move back and forth between lanes, generally without signaling first (although at times the driver would signal after he entered a new lane). At one point, Provost observed the Jeep move into the right lane with its left signal on.

Provost testified that based on his training; his 20 years of experience as a police officer, and the "speeding, the slowing, the passing, the lane changes, the movement ... from one lane to another and then the signal comes on and then back into the first lane," his impression was that the driver of the Jeep was intoxicated. Provost characterized the Jeep's movement as "gross weaving" over several lanes of the Glenn Highway. After observing the Jeep for several minutes, Provost telephoned Anchorage Police Department (APD) dispatch and advised them that he suspected that the driver of the Jeep was intoxicated. Provost asked APD to run a check on the Jeep's license plates and eventually called for assistance.

According to Provost, the Jeep took the Highland Road exit and traveled at an excessive rate of speed as it proceeded down the Loop Road toward Eagle River. Provost

question of whether the district court erred in denying his motion to suppress evidence.

noted in his report that the Jeep moved from the right into the left lane and then back into the right lane traveling faster than the posted speed limit down the Loop Road. As the Jeep (and Provost) approached Kantishna Drive on the Loop Road, dispatch reported to Provost the address to which the vehicle was registered. Provost advised dispatch that the driver appeared to be headed to that address. The Jeep turned left on Kantishna Drive and spun out, turning 270 degrees. The driver corrected the turn and continued to his residence.

Although the driver of the Jeep used his remote control to open the garage door, he parked the Jeep in his driveway. Provost testified that he contacted the driver of the Jeep (Daniel Shearer) as he stepped out of the vehicle. Provost identified himself as a detective with the APD and asked Shearer to step away from the vehicle. Provost conducted a pat down search and obtained Shearer's identification. Provost testified that he detected the odor of alcoholic beverages on Shearer's person. Provost asked Shearer to perform the balance and alphabet field sobriety tests. The alcohol odor and Shearer's difficulty in performing the field sobriety tests, confirmed Provost's initial impression that Shearer was intoxicated.

Shearer had a different account of his initial contact with Provost in the driveway. Shearer testified that he got out of his car and walked up the driveway to enter his home through the basement garage. He had just entered the garage, when he heard someone call out "hey buddy." Shearer turned around and saw a man in civilian clothes signaling at him. Shearer testified that he thought the man was in trouble and needed help, so he walked out of the garage and approached the man. When Shearer got to the end of the driveway, the man identified himself as a police officer.

Shearer was arrested and transported to the Eagle River police substation for an Intoximeter test. Shearer submitted a breath sample, with a resulting .172 blood alcohol level. Shearer was subsequently charged with DWI, in violation of AMC 9.28.020. Shearer moved to suppress the evidence obtained after his initial contact with Provost. Following an evidentiary hearing, Judge Murphy denied the motion. Shearer subsequently pled no contest to DWI.

The question before us is whether the reasonable suspicion standard for an investigatory stop, adopted by the supreme court in *Coleman v. State*,[3] was satisfied in this case. Under *Coleman*, an investigatory stop is only permitted in situations where the police officer has "a reasonable suspicion that imminent public danger exists or serious harm to persons or property has recently occurred."[4] Shearer admits that he "arguably posed an imminent public danger" when he was driving home. Nevertheless, Shearer claims that because he parked his Jeep in his driveway, exited the vehicle and was headed towards his home when Provost contacted him, Provost had no basis to reasonably suspect that Shearer continued to pose an imminent danger to the motoring public. Judge Murphy disagreed.

In addressing the question of reasonable suspicion, Judge Murphy found that Provost had enough information, based on his observations of Shearer's driving, to reasonably believe that Shearer was driving while intoxicated. Judge Murphy next addressed what happened once Shearer arrived home and found that there was nothing to prevent Shearer from getting back into his vehicle and driving again that night. Thus, Judge Murphy concluded that Shearer continued to pose a potential imminent danger to the driving public, even though he had parked his car in his driveway.

Judge Murphy's findings are consistent with prior decisions of this court and the supreme court that have applied the *Coleman* standard to investigatory stops. As Shearer concedes, it is well established that the crime of driving while intoxicated poses significant dangers to the public.[5] In addi-

---

**3.** 553 P.2d 40 (Alaska 1976).

**4.** *Id.* at 46.

**5.** *See Ebona v. State,* 577 P.2d 698, 701 (Alaska 1978); *State v. Moran,* 667 P.2d 734, 735 (Alaska App. 1983).

tion, a DWI suspect does not have to actually be driving the vehicle in order to pose imminent danger to the public.[6] Nevertheless, Shearer claims that Judge Murphy's finding that he posed a continuing danger to the motoring public is not supported by the record because there is no evidence that he would have driven again that night. We rejected similar arguments in *Larson v. State*[7] and *Romo v. Anchorage*.[8]

In *Larson*, a police officer observed the defendant's car stopped in the middle of a dirt road, with the defendant behind the wheel. The officer watched as the defendant pulled up next to two pedestrians, talked to them and then drove north on the wrong side of the road.[9] The officer decided to follow the defendant and he subsequently witnessed several instances of suspicious driving by the defendant. Finally, the officer saw the defendant pull over next to two pedestrians. One of them got into the driver's seat and the defendant slid into the passenger seat.[10] The new driver proceeded to drive down the road and was stopped by the officer. The officer went immediately to the passenger side, contacted the defendant and arrested him for DWI.[11]

The primary issue on appeal in *Larson* was whether the officer made a valid investigatory stop. We agreed with the trial court's finding that the officer had reasonable suspicion (based on his observations of the defendant's driving) that the defendant's driving posed an imminent danger to public safety and that the stop was justified.[12] But, we also addressed the defendant's argument that the "requisite element of danger terminated when [the defendant] allowed an apparent stranger to drive the car in his

place."[13] We upheld the trial judge's finding that the defendant would have resumed driving at a later point and that the officer was not unreasonable in believing that the change in drivers did not eliminate the need to make an investigatory stop.[14]

Similarly, in this case Judge Murphy found that Provost had reasonable suspicion, based on his observations of Shearer's driving, that Shearer posed an imminent danger to public safety. Judge Murphy recognized that the element of danger did not terminate when Shearer exited his vehicle. Although Shearer claims he was home for the night, Judge Murphy found that there was nothing to prevent Shearer from going inside his house, coming back out, and driving again. We agree that the imminent danger Shearer posed to the driving public did not cease simply because Shearer pulled into his driveway and exited his vehicle. Our conclusion is supported by our decision in *Romo*.

In *Romo*, a police officer decided to follow the defendant after recognizing a prostitute in the front seat of his vehicle. The officer saw no indication from defendant's driving that he was intoxicated. The defendant pulled into a parking lot. The officer followed, but did not activate his lights.[15] The defendant voluntarily got out of his vehicle and approached the officer, who then noticed the odor of alcohol on the defendant. In response to questioning from the officer, the defendant admitted that he had been drinking. The officer then asked the defendant to perform field sobriety tests, which he failed.[16]

Based on the above facts, we found that the police officer had "sufficient reasonable suspicion" that the defendant in *Romo* was driving while intoxicated. We thus conclud-

**6.** *See Jacobson v. State,* 551 P.2d 935, 938 (Alaska 1976) ("An intoxicated person seated behind the steering wheel of a motor vehicle [that is not moving] is a threat to the safety and welfare of the public") (citations omitted). *See also State, Department of Public Safety v. Conley,* 754 P.2d 232, 236 (Alaska 1988); *Lathan v. State,* 707 P.2d 941, 943 (Alaska App.1985).

**7.** 669 P.2d 1334 (Alaska App.1983).

**8.** 697 P.2d 1065 (Alaska App.1985).

**9.** 669 P.2d at 1335.

**10.** *Id.* at 1336.

**11.** *Id.*

**12.** *Id.*

**13.** *Id.* at 1337.

**14.** *Id.*

**15.** 697 P.2d at 1067.

**16.** *Id.*

ed that the officer was justified in performing an investigatory stop in order to administer field sobriety tests.[17] We also rejected the defendant's contention that since he stopped his car in his apartment parking lot and exited his car, the officer could not reasonably believe, as required by *Coleman,* that "imminent public danger" existed any longer from his driving:

> In the instant case, Judge Finn made no specific finding as to the likelihood of Romo's driving again or the reasonableness of Officer Plummer's belief of imminent public danger. We are satisfied as a matter of law that an investigatory stop was proper in this case. The fact that Romo was driving just prior to his encounter with Officer Plummer demonstrated Romo's willingness to drive in his current condition. At the time of the encounter, Romo retained possession of his car and it remained immediately accessible for him to drive. Under these circumstances there was a sufficient risk of imminent public danger to warrant an investigatory stop.[18]

We believe that our reasoning in *Romo* is also applicable to this case. Provost's observations of several miles of suspicious driving by Shearer provided him with a particularized and objective basis to suspect that Shearer was driving while intoxicated. Judge Murphy found that the fact that Shearer had exited his vehicle and was headed towards his home did not eliminate the risk that Shearer would get back in his vehicle and resume driving. We do not believe that this finding is clearly erroneous. The fact that Shearer drove his Jeep just prior to his encounter with Provost demonstrated his willingness to drive while intoxicated. Further, at the time of Shearer's encounter with Provost, Shearer retained possession of the vehicle and it remained "immediately accessible" for him to drive. We conclude that, under *Romo,* there was a sufficient risk of imminent public danger in this case to warrant an investigatory stop.[19]

Shearer attempts to distinguish *Romo* by arguing that the encounter in *Romo* did not become an investigatory stop until after the officer asked the defendant to perform field sobriety tests, and that in this case, the encounter was an investigatory stop as soon as Provost made contact with Shearer. We believe that this distinction is immaterial. The ultimate issue in this case—whether Provost could reasonably believe that "imminent public danger" continued to exist after Shearer exited his vehicle—is answered affirmatively by *Romo.*[20] Shearer also argues that the officer in *Romo* didn't know the defendant lived in the apartment complex next to the parking lot, nor did the defendant start walking towards his house. However, this distinction does not change the fact that, like the defendant in *Romo,* Shearer still had access to his car at the time of the encounter with Provost. Further, Shearer had just demonstrated his willingness to drive while intoxicated. Thus, Provost could reasonably believe that there was a sufficient risk of imminent public danger to justify an investigatory stop.[21]

For the reasons discussed above, we conclude that Judge Murphy properly denied Shearer's motion to suppress evidence. The judgment of the district court is AFFIRMED.

MANNHEIMER, Judge, dissenting.

Under Alaska law, a police officer who has reason to believe that a person is driving while intoxicated can stop the motorist to investigate. In *Ebona v. State*[1], the supreme court held that this investigative stop is justified because a person who is driving while intoxicated presents an "imminent public danger". The question in this case is whether an investigative stop remains justified even after the motorist parks the car, turns off the engine, and walks away, with no indication that the motorist intends to resume driving. I conclude that, under such

17.  *Id.* at 1069.

18.  *Id.* at 1069–1070.

19.  *Id.*

20.  *Id.*

21.  *Id.*

1.  577 P.2d 698, 700–701 (Alaska 1978).

circumstances, there is no imminent public danger, and so an investigative stop is not allowed.

### Underlying facts

Police Officer Anthony Provost saw Daniel Shearer driving erratically just after midnight on January 20, 1999. Shearer concedes that his erratic driving gave Provost a reasonable basis to suspect that Shearer was driving while intoxicated. Because of this reasonable suspicion, Provost would have been justified in stopping Shearer's vehicle to investigate this potential crime.[2] But the traffic stop would have been difficult because Provost was off-duty: he was dressed in civilian clothes, and he was driving a private vehicle without emergency lights or a siren. So instead of performing a traffic stop, Provost followed Shearer. He called for a backup officer, and he also asked police dispatch to run a check on Shearer's vehicle registration.

The dispatcher told Provost that Shearer lived on Kantishna Drive in Eagle River. With Provost behind him, Shearer drove to the Kantishna Drive address, turned into the driveway, and parked his car. Provost parked his own vehicle on the street. As Provost watched, Shearer used a remote control to open his garage door. He then walked toward the house, preparing to enter through the garage.

At this point, Provost called out to Shearer and asked him to come back down the driveway. Shearer did not know that Provost was a police officer; he assumed that Provost was a motorist who was either lost or was having car trouble. But as soon as Shearer walked up to Provost, Provost displayed his badge. He directed Shearer to perform field sobriety tests. Based on Shearer's performance, Provost arrested him for driving while intoxicated.

The Municipality of Anchorage concedes that, before Shearer performed the field sobriety tests, Provost had only a reasonable suspicion that Shearer was under the influence rather than probable cause to make an arrest. The Municipality further concedes that Provost coerced Shearer to perform the field sobriety tests through a display of authority. For his part, Shearer concedes that, by the end of the field sobriety tests, Provost had obtained enough information about Shearer's level of intoxication to justify an arrest. That is, by the end of the field sobriety tests, Provost had probable cause to believe that Shearer was under the influence. The problem is the manner in which Provost obtained this information.

Shearer voluntarily walked down the driveway to speak to Provost. Had Provost merely engaged in conversation with Shearer, the officer conceivably could have gleaned sufficient information from Shearer's speech, demeanor, and balance to establish probable cause to make an arrest. But Provost immediately displayed his badge and directed Shearer to perform field sobriety tests. These actions constituted an investigative stop—a seizure for Fourth Amendment purposes. The question is whether this seizure was legal.

### The requirement of "imminent public danger"

In *Coleman v. State*[3], the Alaska Supreme Court was asked to decide whether the Alaska Constitution permits a police officer to conduct an investigative stop based on reasonable suspicion (*i.e.*, less than probable cause). The court ruled that investigative stops based on reasonable suspicion are permitted in two instances: when the officer has reason to believe that "imminent public danger exists", or when the officer has reason to believe that "serious harm to persons or property has recently occurred".[4]

Shearer's case points out a crucial distinction between these two categories. If an investigative stop is justified because there is reason to believe that "serious harm ... has recently occurred", it does not matter whether the crime is continuing or has been completed. In either case, *Coleman* authorizes the investigative stop. But if the investiga-

---

**2.** *See Ebona,* 577 P.2d at 700–701.

**3.** 553 P.2d 40 (Alaska 1976).

**4.** *Id.* at 46.

tive stop is justified because there is reason to believe that "imminent public danger exists", then the government must establish reason to believe that the crime is ongoing or that the crime has set events in motion that will endanger the public unless the crime is revealed or the events interrupted.

Neither the supreme court nor this court has ever decided whether the crime of driving while intoxicated falls within *Coleman*'s second category of "serious harm to persons or property".[5] But in *Ebona v. State*[6], the supreme court held that a motorist who drives while intoxicated constitutes an "imminent public danger". Thus, when a police officer sees a person driving a motor vehicle and the officer has reason to believe that the driver is intoxicated, the officer is authorized to conduct a traffic stop and investigate.[7]

But Shearer's case is different: Shearer was no longer driving a motor vehicle when Provost performed the investigative stop. Shearer had reached his residence, he had parked his car and turned off the engine, and he was entering his house. Shearer contends that Provost violated *Coleman* when he performed the investigative stop at the foot of Shearer's driveway because, by the time Provost conducted the stop, Shearer no longer posed an imminent danger to the public safety or welfare. Shearer points out that his act of driving was over, and he argues that there was no reason to believe that he would resume driving in the near future.

The Municipality of Anchorage offers two answers to Shearer's argument.

First, the Municipality asserts that driving while intoxicated falls within *Coleman*'s second category—that this offense constitutes "serious harm to persons or property". If so, then Provost would have been justified in performing an investigative stop even though Shearer's offense was over.

But the Municipality did not raise this argument in the trial court, and the district court did not decide this issue. Rather, the district court ruled that the investigative stop was justified under *Coleman*'s first category (imminent public danger). Moreover, the Municipality did not raise this issue in its brief to this court. Instead, the Municipality raised this issue for the first time during oral argument. Given these circumstances, the Municipality has waived its contention that DWI falls within *Coleman*'s second category.[8]

The Municipality's remaining contention is that, even though Shearer had stopped driving, he continued to pose a danger to the public. The district court upheld the investigative stop on this basis. The court ruled that, even though Shearer had parked his car and was on his way into the house, it was at least possible that Shearer might shortly return to his car and begin driving again.

*Why I conclude that the Municipality failed to establish a reasonable suspicion that Shearer posed an imminent public danger*

It is the government's burden to justify any warrantless seizure. An investigative stop must be based on reasonable suspicion—"specific and articulable facts which, taken together with [the] rationale inferences from those facts, reasonably warrant the intrusion."[9] Because *Coleman*'s first prong requires proof of imminent public danger, we must ask the following question: When Officer Provost performed the investigative stop at the foot of Shearer's driveway, was he aware of specific and articulable facts indicating that Shearer posed an imminent danger to the public? Or, to rephrase this question with reference to the particular facts of this case: Did Provost have specific and articulable reasons for believing that Shearer would leave his house and resume driving before he regained sobriety?

---

5. *See Romo v. Anchorage,* 697 P.2d 1065, 1070 n. 2 (Alaska App.1985).

6. 577 P.2d at 700–701.

7. *Ebona,* 577 P.2d at 701.

8. *Petersen v. Mutual Life Ins. Co.,* 803 P.2d 406, 411 n. 8 (Alaska 1990) (issues not briefed are waived).

9. *Coleman,* 553 P.2d at 45 (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)).

The majority believes that the answer is supplied by *Romo v. Anchorage*.[10] In *Romo,* a police officer followed the defendant's pickup truck because he recognized the woman passenger as a known prostitute. Romo pulled into the parking lot of his apartment building and stopped his truck. The officer stopped his patrol car some forty to fifty feet away, but he did not attempt to make contact with Romo.[11] After a few moments, Romo got out of his truck and walked back to the patrol car to engage in conversation with the officer. During that conversation, the officer smelled alcoholic beverages on Romo's breath, and Romo admitted that he had been drinking. When Romo failed various field sobriety tests, the officer arrested him for driving while intoxicated.[12]

One of Romo's arguments on appeal was that, even after the officer observed signs of his intoxication, the officer had no authority to ask Romo to perform the field sobriety tests or to take any other action amounting to an investigative stop. Romo contended that, because he stopped his truck in the parking lot of his apartment building, and because he got out of his car to talk to the officer, there was no longer an "imminent public danger" as required by *Coleman.* This court rejected Romo's argument:

> We are satisfied as a matter of law that an investigatory stop was proper in this case. The fact that Romo was driving just prior to his encounter with Officer Plummer demonstrated Romo's willingness to drive in his [intoxicated] condition. At the time of the encounter, Romo retained possession of his car and it remained immediately accessible for him to drive. Under these circumstances[,] there was a sufficient risk of imminent public danger to warrant an investigative stop.

*Romo,* 697 P.2d at 1069–1070.

My colleagues interpret *Romo* to mean that, even after a suspected intoxicated driver stops driving, a police officer will always be authorized to conduct an investigative stop because there is always some conceivable possibility that the motorist will resume driving. This is stretching *Romo* too far.

In *Romo,* the officer could reasonably conclude that Romo had merely interrupted his driving in order to talk with the officer. Romo stopped his vehicle and walked over to the officer's patrol car, but he gave no indication that he had reached his final destination or that he intended to stop driving. As this court stressed, "Romo retained possession of his car and it remained immediately accessible for him to drive."

The majority concedes that Shearer's case is different. Shearer parked his car in his driveway, he turned off the engine, and he was proceeding into his house when Officer Provost called him back. The hour was midnight—a time when people ordinarily return home for the night. Nevertheless, the majority concludes that Officer Provost had a specific, articulable basis for believing that Shearer continued to pose an imminent danger to the public safety.

The district judge who upheld the investigative stop reasoned that Shearer might conceivably have been going home just to retrieve more alcoholic beverages and then resume driving. One can also imagine other scenarios in which Shearer might resume driving even though he initially intended to remain at home—for example, if his children demanded that he take them out for a midnight snack, or if Shearer's wife threw him out of the house, forcing him to seek new lodgings.

These (and other) speculative possibilities can not be ruled out. But *Coleman* and *Terry v. Ohio* require more than speculative possibilities. To justify the investigative seizure in this case, the government must point to specific and articulable facts that would lead a reasonable person to believe that Shearer intended to return to his car and resume driving while he was still intoxicated. In the absence of an affirmative reason to suspect that Shearer would resume driving, the investigative stop is illegal.

**10.**  697 P.2d 1065 (Alaska App.1985).

**11.**  *See id.*

**12.**  *See id.*

*Romo* does not alter this rule of law. Rather, the result in *Romo* rests on application of this rule to the particular facts of Romo's case. This becomes clearer if we consider a slight variation of the facts in Shearer's case.

Suppose that Officer Provost, unsure of how to proceed, had simply watched while Shearer entered his garage, walked into his house, and closed the garage door behind him. After waiting several minutes for Shearer to re-emerge, Officer Provost contacts a police supervisor and asks for advice. The supervisor tells Provost to knock on Shearer's front door and see if Shearer will come outside to talk. By now, twenty minutes have gone by, and Shearer's house is dark. Provost knocks for several minutes. At length, Shearer answers the door. He is dressed in pajamas, he is barefoot, and he has a toothbrush in his hand. He is obviously preparing for bed.

Under these hypothetical facts, there is no specific, articulable reason to believe that Shearer would resume driving. Thus, even if there was reason to believe that Shearer was intoxicated, there would be no reason to believe that he presented an "imminent public danger", and so a *Coleman* investigatory stop would not be permitted.

Concededly, the actual facts of Shearer's case do not so clearly prove Shearer's lack of intent to resume driving. But it is not Shearer's burden to negate all speculative possibility that he might decide to leave his house and begin driving again. Rather, it is the Municipality's burden to come forward with specific, articulable facts that affirmatively indicate that Shearer might resume driving. There are no such facts in this case.

Accordingly, Provost's investigative stop of Shearer was unlawful, and the evidence obtained during that investigative stop should have been suppressed. I would reverse Shearer's conviction.

