Morgan C. HARTMAN, Appellant,

v.

STATE of Alaska, DEPARTMENT OF
ADMINISTRATION, DIVISION OF
MOTOR VEHICLES, Appellee.

No. S–11823.

Supreme Court of Alaska.

Jan. 26, 2007.

Rehearing Denied March 2, 2007.

Robert John, Law Office of Robert John, Fairbanks, for Appellant.

Richard W. Postma, Jr., Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

This is an administrative appeal of a Department of Motor Vehicles (DMV) decision revoking Morgan Hartman's Alaska driver's license for driving while under the influence (DUI). At the license revocation hearing, the arresting officer relied on a recording of the conversation he had had with Hartman before the arrest. Hartman, a pro se litigant who had unsuccessfully sought a continuance to obtain further evidence, did not have a copy of the recording, and the hearing officer made no effort to assist Hartman in obtaining the recording. Based in part on the officer's recollection of the recording, the hearing officer revoked Hartman's license for ninety days and the superior court affirmed.

Hartman raises four issues on appeal. First, he claims that the stop leading to his arrest was unconstitutional. Second, he maintains that the hearing officer abused her discretion by denying his request for a continuance. His third claim—closely related to the second—is that he was denied due process of law by the State's failure to furnish a copy of the recording at his hearing. Finally, he argues that DMV failed to provide notice of the procedures that it would follow. Because the hearing officer erred by failing to inform Hartman of the correct procedures for obtaining the central piece of evidence in the case, even though he was clearly attempting to obtain potentially exculpatory evidence, we reverse the judgment of the superior court and remand to DMV for further proceedings consistent with this opinion.

## II. FACTS AND PROCEEDINGS

### A. Hartman's Arrest

On August 29, 2003, State Trooper Tim Tuckwood responded to a report from Tim Somerlot, a Delta Junction resident, that a group of juveniles had abandoned a car in a ditch and left the scene in a "tan Ford Taurus-type vehicle." According to Somerlot, the group consisted of two males and two females.

Tuckwood investigated the abandoned vehicle, finding that it was a dented, white Honda Accord with fluid leaking from the radiator. The windows were open, and Tuckwood noticed that the interior "had a strong odor of alcohol." Although the car had no license plate, Tuckwood ran the vehicle identification number and determined that it belonged to John Hartman, who lived nearby. After unsuccessfully attempting to contact Hartman, Tuckwood called a towing company. Before the tow truck arrived, Tuckwood saw "a small tan vehicle similar to a Ford Taurus [drive] by," and noticed that "several people" were in the car. One of the passengers was Morgan Hartman, the son of John Hartman.

Tuckwood stopped the car and questioned Hartman. According to Tuckwood, Hartman appeared to be intoxicated, "due to a strong odor of alcohol, bloodshot eyes, slurred speech, and a stagger[ing] step." He failed three roadside sobriety tests, and refused to take any others. When asked about the Honda, Hartman admitted to having driven it, and said that he had "parked it in the ditch" when the radiator overheated. According to Tuckwood, Hartman claimed to have been alone when driving, but two of the passengers from the Ford Taurus maintained that they had been in the Honda when Hart-

man was driving. One of the passengers, Mariah Morris, said that she knew Hartman was intoxicated.[1]

Tuckwood arrested Hartman for driving while under the influence. A breath sample taken from Hartman showed an alcohol concentration of .158g/210L, an amount substantially higher than the legal limit of .08. Hartman declined to take a second test, and was issued a citation for underage drinking. Before being released on bail, he was given notice that his license would be suspended, and informed that he could challenge the suspension at an administrative hearing.

### B. Administrative Hearing

Hartman requested a hearing, and one was scheduled for October 21, 2003. On October 15 he requested that the hearing be postponed "due to the fact that [he had] so far been unable to gather all the evidence that [he] need[ed]." He also requested that Tuckwood be subpoenaed, and stated that his defense would be based on AS 04.16.051(b)[2] and *Snyder v. State, Department of Public Safety, Division of Motor Vehicles.*[3] On October 21 Hartman participated telephonically and pro se in the hearing. At the beginning of the hearing, the request for a continuance was denied[4] on the ground that Hartman could have requested discovery, but did not.

The hearing officer heard testimony from Tuckwood, Hartman, Hartman's mother, and Crystal Mercer, the driver of the Ford Taurus. Tuckwood's initial testimony mirrored his police report. Specifically, he claimed that Hartman "tried to tell [him] that he wasn't intoxicated because he doesn't drink."

Hartman testified that he was contesting the license revocation because he did not become intoxicated until after he left the Honda. He claimed that he was driving the Honda off-road[5] with two friends, and that

---

1. It is unclear whether Morris meant that Hartman was intoxicated at the time Tuckwood asked or when he was driving the Honda.

2. AS 04.16.051(a) forbids the delivery of alcoholic beverages to those under twenty-one, but AS 04.16.051(b)(1) makes an exception for alcohol given "by a parent to the parent's child."

3. 43 P.3d 157 (Alaska 2002). In *Snyder*, the driver claimed that he had not become intoxicated until after he crashed his vehicle. *Id.* at 158.

4. Although the hearing officer did not inform Hartman of her decision until the day of the hearing, the notice of administrative hearing states that, in the absence of an answer regarding a motion for postponement, "the motion may be considered denied."

5. Hartman described it as a "field car," as opposed to a "highway car," and denied that he had driven it on the road.

he parked it when the transmission malfunctioned. At that point, he asserted, he had not yet had anything to drink. After the car broke down, Hartman and his friends began walking to Hartman's house, but soon saw Mercer pass by in a tan Ford Taurus. Mercer gave them a ride, and Hartman invited all of them to have dinner with his family. Hartman had several beers during dinner.[6] The four then left in the Ford Taurus, with Mercer driving. When they were pulled over, Hartman testified, he told Tuckwood that he "was drinking after [he] drove," a claim that Tuckwood "must have misinterpreted."

The hearing officer called Tuckwood again, and asked if he had a tape recording of the contact and arrest. Tuckwood responded in the affirmative, and the hearing officer noted that she did not have a copy of it. Tuckwood proceeded to testify about the tape, claiming that it supported his account of what Hartman had said. Hartman did not have a copy of the tape and was thus unable to verify Tuckwood's recollection of its content or cross-examine Tuckwood about it.

Hartman's mother corroborated her son's claim that he had been drinking at dinner but not earlier. She also described Hartman's earlier unsuccessful attempt in his criminal case to procure a tape recording of the arrest and his public defender's response that no tape existed:

> And as far as the tapes, Ma'am, supposedly Officer Tuckwood said he—there's a tape in existence that said [Hartman] said he was drinking. But then there is no tape. There's no such thing. We tried to get the tape. [Hartman] tried to get a copy of it from his public defender. The reason why he can't is because there is none. It doesn't exist.

On October 30 the hearing officer issued a decision. In her findings, she noted that Hartman was the driver of the Honda, and that Hartman was "highly intoxicated" when Tuckwood arrested him. She also found "that the contact tape does exist" and that Tuckwood's testimony about its contents was credible. Based on these findings, the breath alcohol test, and her negative assessment of Hartman's credibility, the hearing officer determined that Hartman had been driving while under the influence. She therefore affirmed the ninety-day revocation of his license.

Hartman appealed this decision to the superior court. The superior court held that Tuckwood had reasonable suspicion to make the stop and probable cause to arrest Hartman. It also determined that DMV's failure to furnish Hartman a copy of the recording absent any request did not violate Hartman's right to due process. Similarly, it ruled that Tuckwood's reliance on a recording that had not been furnished to Hartman did not violate Hartman's rights under the confrontation clause, because Tuckwood "merely used it to confirm his memory of Hartman's statements." Finally, the superior court held that the hearing officer did not abuse her discretion by denying Hartman's request for a continuance. For these reasons, the superior court affirmed the hearing officer's decision. Hartman's subsequent petition for rehearing was denied, and this appeal followed.

## III. DISCUSSION

### A. Standard of Review

When reviewing license revocation hearings, we apply the standard of review set forth in *Nevers v. State, Department of Administration*:

> We review license revocation hearings under AS 28.15.166(m), which provides that the court may reverse the department's determination if the court finds that the department misinterpreted the law, acted in an arbitrary and capricious manner, or made a determination unsupported by the evidence in the record. Where the superior court acts as an intermediate court of appeals, we independently review the hearing officer's decision. For legal questions not involving agency expertise, we apply the substitution of judgment standard. We also review constitutional questions de

---

**6.** Mercer testified that Hartman appeared to be sober before dinner, but that he had consumed beer during dinner.

novo, and will adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[7]

### B. Legality of the Investigatory Stop

Hartman first argues that the investigatory stop of the tan Ford Taurus was unconstitutional because it was not justified by reasonable suspicion.[8] As a result, he claims, this evidence should have been suppressed.

The exclusionary rule provides that "evidence obtained from an unconstitutional search or seizure is inadmissible and must be excluded."[9] Although this rule "generally does not apply to license revocation proceedings,"[10] we have held that an exception applies in certain contexts, such as "police misconduct which shocks the conscience, or is of a nature that calls for the judiciary, as a matter of judicial integrity, to disassociate itself from benefits derivable therefrom."[11] In addition, "where a Fourth Amendment violation stems from a lack of probable cause for a DUI arrest, exclusion may well be mandated because probable cause is an affirmative statutory element of the offense of refusal and is an affirmative element for proof in the license revocation proceeding."[12] But we need not reach the applicability of exceptions to the general rule in this case

because the investigative stop was not an unreasonable search or seizure.

In Alaska, a police officer may make an investigatory stop if the officer has "a reasonable suspicion that imminent public danger exists or serious harm to persons or property has recently occurred."[13] Reasonable suspicion exists where the totality of the circumstances indicates that there is a "substantial *possibility* that conduct [giving rise to a public danger] has occurred, is occurring, or is about to occur."[14] Thus, where a police officer has "reasonable suspicion that a driver is operating a vehicle while intoxicated,"[15] the officer may conduct an investigatory stop.[16]

While we have held that a person who is driving while under the influence poses an "imminent public danger," warranting an investigatory stop,[17] we have not considered whether a person who has recently been behind the wheel while intoxicated but is no longer driving continues to pose an imminent public danger. In a series of three cases,[18] the court of appeals has addressed this specific issue. In *Larson v. State*, a police officer observed a car stopped in the middle of the road, and then watched as the driver of the car, Larson, drove on the wrong side of the road, tried to pick up pedestrians, and

7. 123 P.3d 958, 961 (Alaska 2005) (citations and quotation marks omitted).

8. The State points out that Hartman did not raise this issue before the hearing officer. *Cf. Snyder*, 43 P.3d at 161 n. 9 (holding that a driver "waived his *Miranda* claim by failing to argue it at the initial ... hearing"). But, in its brief and arguments before the superior court, the State did not raise the waiver issue. The State, therefore, has waived the right to argue that Hartman waived the search issue.

9. *Nevers*, 123 P.3d at 962. This rule is applicable in both state and federal courts. *See Ellison v. State*, 383 P.2d 716, 718 (Alaska 1963) (citing *Mapp v. Ohio*, 367 U.S. 643, 654–55, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) for the proposition that the exclusionary rule "operates as a constitutional mandate upon the state courts").

10. *Nevers*, 123 P.3d at 964.

11. *Id.* (quoting *State v. Sears*, 553 P.2d 907, 914 (Alaska 1976)).

12. *Nevers*, 123 P.3d at 963 n. 21.

13. *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976).

14. *Saltz v. State, Dep't of Admin., Div. of Motor Vehicles*, 126 P.3d 133, 136 (Alaska 2005) (citing *State v. Moran*, 667 P.2d 734, 735–36 (Alaska App.1983)).

15. *Saltz*, 126 P.3d at 136.

16. *Id.; see also State v. G.B.*, 769 P.2d 452, 456 (Alaska App.1989) (noting that police officers may conduct investigatory stops in cases where "a prompt investigation is required ... as a matter of practical necessity") (citation omitted).

17. *Ebona v. State*, 577 P.2d 698, 701 (Alaska 1978).

18. *Shearer v. Municipality of Anchorage*, 4 P.3d 336, 338–40 (Alaska App.2000); *Romo v. Municipality of Anchorage*, 697 P.2d 1065, 1069–70 (Alaska App.1985); *Larson v. State*, 669 P.2d 1334, 1337 (Alaska App.1983).

almost hit a group of pedestrians.[19] The officer then witnessed Larson pick up two pedestrians, one of whom took over driving.[20] The officer stopped the car, immediately approached Larson, now a passenger, observed that he appeared intoxicated, and arrested him for DUI.[21] The court of appeals concluded that the district court did not clearly err when it found that "it was likely that Larson would have resumed driving at some later point, and that [the officer] was not unreasonable in believing that the change of drivers did not eliminate the need to make an investigatory stop." [22]

In *Romo v. Municipality of Anchorage,* a police officer began following the defendant after observing a known prostitute in the cab of the truck that the defendant was driving.[23] The defendant, who was not driving erratically, pulled into a parking lot, exited the truck, and voluntarily approached the police officer.[24] When the police officer noticed that Romo had an "odor of alcoholic beverage about his ... person," he asked Romo to perform a field sobriety test.[25] The court of appeals concluded the test was justified by reasonable suspicion.[26] The court explained that "[t]he fact that Romo was driving just prior to his encounter with [the officer] demonstrated Romo's willingness to drive in his current [intoxicated] condition." [27] The court of appeals went on to reason that because "Romo retained possession of his car and it remained immediately accessible for him to drive," [28] "there was a sufficient risk of imminent public danger to warrant an investigatory stop." [29]

In *Shearer v. Municipality of Anchorage,* a police officer noticed a jeep being driven erratically on the Glenn Highway and followed the vehicle until its owner pulled the jeep into his driveway.[30] The officer contacted the driver, Shearer, as he was heading into his house, and, noticing that Shearer smelled of alcohol, asked him to perform field sobriety tests.[31] As in *Romo,* the court of appeals pointed to Shearer's continuing possession of the vehicle as a factor increasing the likelihood that he would resume driving, but did not state that possession was, in all cases, a necessary condition for finding an imminent public danger:

> [L]ike the defendant in *Romo,* Shearer still had access to his car at the time of the encounter with [the police officer]. Further, Shearer had just demonstrated his willingness to drive while intoxicated. Thus, [the officer] could reasonably believe that there was a sufficient risk of imminent public danger to justify an investigatory stop.[32]

In this case, although Hartman was no longer driving his car, the investigatory stop was still proper. Somerlot reported that the Honda "whip[ped]" into his yard and "crashed" into a ditch in front of his house. Somerlot then saw the juveniles exit the Honda and get into a "tan Ford Taurus[-]type vehicle." There was no license plate on the Honda, but the vehicle identification number indicated that it belonged to John Hartman, whose teenage son Tuckwood knew. Tuckwood noted that the Honda smelled strongly of alcohol. While waiting for the tow truck to arrive, Tuckwood saw a tan Ford Taurus-like vehicle with juveniles in it drive by the abandoned Honda. Tuckwood therefore had a reasonable suspicion that someone had been driving the Honda while under the influence and that the intoxicated driver of the Honda was likely in the Ford

19.  669 P.2d at 1335.

20.  *Id.*

21.  *Id.* at 1335–36.

22.  *Id.* at 1337.

23.  697 P.2d at 1067.

24.  *Id.*

25.  *Id.*

26.  *Id.* at 1068–69.

27.  *Id.* at 1069.

28.  *Id.*

29.  *Id.* at 1069–70.

30.  4 P.3d at 337–38.

31.  *Id.* at 338.

32.  *Id.* at 340 (citation omitted).

Taurus when Tuckwood stopped it. Although Hartman was now a passenger in the Ford Taurus, this is not enough to show that he no longer posed an imminent public danger. Passenger status did not automatically establish a non-driving intention on Hartman's part.[33] Nor was Hartman's non-ownership of the Ford Taurus determinative absent evidence that the owner of the vehicle was unwilling to give him a chance to drive. In view of Hartman's continuing access to the Taurus, Tuckwood's belief that Hartman posed an imminent public danger was reasonable. Therefore, under these circumstances, the investigatory stop was legal.

### C. Denial of a Continuance and Failure To Provide the Recording

Hartman maintains that the superior court erred by denying him a continuance to obtain additional evidence. Because this claim is closely related to his argument about the recording—that the State violated his right to due process by failing to furnish the central piece of evidence in the case—the two issues will be treated together.

A driver has "a constitutional right to a meaningful hearing before the state can suspend his [or her] license."[34] In defining a meaningful hearing, "we are guided by 'considerations of fundamental fairness,'"[35] which require that "the same procedural safeguards apply in civil driver's license revocation proceedings for driving while intoxicated as apply in criminal prosecutions for that offense."[36] One such safeguard is the requirement that the State "preserve and make available to a criminal defendant material evidence gathered in a criminal investigation which may prove important in the preparation of the accused's defense."[37] A meaningful license revocation hearing, like a meaningful trial, should therefore include "the presence of the arresting officer, the production of the report of the arresting officer and any tape recordings, videotapes, or transcripts concerning events surrounding the arrest."[38]

The State asserts that it is generally not required to furnish such evidence in the absence of a request,[39] and points out that Hartman did not explicitly request a copy of the tape. But Hartman, a pro se litigant,

**33.** See *Larson*, 669 P.2d at 1335–37 (affirming the validity of an investigatory stop after a third party had taken the defendant's place at the wheel and the defendant had become a passenger).

**34.** *Champion v. Dep't of Pub. Safety*, 721 P.2d 131, 133 (Alaska 1986); see also *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1135–36 (Alaska 2001) (noting that "a driver's license is an important property interest," and that our cases "underscore the importance of the right to drive").

**35.** *Thorne v. Dep't of Pub. Safety, State of Alaska*, 774 P.2d 1326, 1329 (Alaska 1989) (quoting *Whisenhunt v. Dep't of Pub. Safety*, 746 P.2d 1298, 1300 (Alaska 1987)).

**36.** *Barcott v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 741 P.2d 226, 228 (Alaska 1987) (citing *Champion*, 721 P.2d at 133); see also *Whitesides*, 20 P.3d at 1135–36, 1138–39 (noting that DMV must permit the accused to test the reliability of evidence and may not consider evidence obtained in violation of the right to counsel, and holding that an in-person hearing must be provided on request where the credibility of a party is at issue).

**37.** *Thorne*, 774 P.2d at 1330 (holding that the State's failure to preserve a videotape of field sobriety tests taken an hour after a DWI arrest

violated the driver's right to due process in a license revocation hearing); see also *Snyder v. State (Snyder I)*, 930 P.2d 1274, 1282 (Alaska 1996) (noting, in the context of a criminal prosecution for driving while intoxicated, that "[i]t is a fundamental tenet of due process of law that a person accused of a crime has a right to attempt to obtain exculpatory evidence. And it is well established that law enforcement has a duty to preserve and disclose material evidence, the dereliction of which can deprive the accused of due process."). This is particularly true where the evidence is of a type that the State can easily preserve. See *Thorne*, 774 P.2d at 1330 (explaining, in the context of a videotape, that "considerations of fundamental fairness dictate that where the burden of preservation is so slight, evidence being potentially relevant to an issue of central importance at the revocation proceeding should be preserved").

**38.** *Graham v. State*, 633 P.2d 211, 216 n. 12 (Alaska 1981).

**39.** But see *Snyder I*, 930 P.2d at 1278 (holding that the State was required to help a suspect obtain evidence in the "unique evidentiary circumstance" of a request for an independent blood test in connection with a DWI arrest).

had requested a continuance on the ground that he had "so far been unable to gather all the evidence that [he] need[ed]," and the court heard testimony that he had previously (but unsuccessfully) attempted to obtain a copy of the recording. We have stated that a "trial judge should inform a pro se litigant of the proper procedure for the action he or she is obviously attempting to accomplish." [40] Here, Hartman was "obviously attempting" [41] to obtain potentially exculpatory evidence, and the central piece of evidence in this case was the recording. [42] His failure to request a copy at the close of the hearing appears to have been the product of a belief that the tape did not exist. [43] In this situation, the hearing officer should have informed Hartman that he could request a copy of the tape and, if the State failed to provide the requested evidence, that she could impose an appropriate sanction. [44] Her failure to inform Hartman of the procedure by which he could procure the tape that he had previously sought, and her issuance of a decision that was based largely on a recording that neither she nor the accused had heard, violated Hartman's right to due process. We therefore remand for a new hearing.

### D. Notice of DMV's Procedures

Finally, Hartman claims that the hearing officer denied him "advance notice of [DMV's] method of proceeding" by: (1) failing to inform him before the day of the hearing that his continuance would be denied; (2) not giving him notice that she would be considering testimony about the recording; and (3) failing to state when she would issue a judgment. But the notice of administrative hearing stated that, in the absence of an answer regarding a motion for postponement, "the motion may be considered denied." The second and third elements of Hartman's notice claim are moot. Because we hold that the hearing officer's conduct regarding the recording was unconstitutional, we need not address the question whether Hartman received notice that testimony regarding the recording would be considered. Similarly, because we are remanding for a new hearing, we need not determine whether the hearing officer provided sufficient notice of the date of her decision.

---

**40.** *Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987); *see also Genaro v. Municipality of Anchorage*, 76 P.3d 844, 846–47 (Alaska 2003) (holding that the superior court erred by failing to inform a pro se litigant who was "obviously attempting" to use a Rule 36(b) motion to preclude summary judgment of the procedure for doing so); *Collins v. Arctic Builders*, 957 P.2d 980, 982 (Alaska 1998) (holding that the superior court erred by failing to inform a pro se litigant of the specific defects in his notice of appeal and give him an opportunity to remedy those defects).

**41.** *Breck*, 745 P.2d at 75. This is distinguishable from a situation where the court has reason to believe that discovery issues have been resolved. *Cf. Rollins v. State, Dep't of Rev., Alcoholic Beverage Control Bd.*, 991 P.2d 202, 212 (Alaska 1999) (holding that the due process rights of an applicant for a beverage dispensary license were not violated by the hearing officer's failure to inquire into alleged discovery violations by the State because "correspondence between [the applicant] and the Board, copied to the hearing officer, reasonably indicated that the discovery issues were resolved").

**42.** In many DUI cases, the most important evidence is the alcohol test result. *See, e.g., Barcott*, 741 P.2d at 228–30 (discussing whether due process requires consideration of the "inherent inaccuracy" of a breath alcohol test when the result

is within the margin of error). But Hartman did not claim during the hearing that he was not intoxicated. Rather, his defense was that he did not start drinking until after he stopped driving. The hearing officer's negative credibility assessment was largely based on Tuckwood's claims that Hartman had denied having consumed any alcohol at the time of arrest. By proving or disproving this, the tape could have had a decisive effect on the result.

**43.** According to the testimony of Hartman's mother, he instructed his public defender to obtain a copy in the criminal case, but no copy was provided. Even after Tuckwood told the hearing officer about the contents of the tape, Hartman's mother testified that "there is no tape," and that the reason why Hartman was unable to obtain it from his public defender was because it did not exist.

**44.** Sanctions would be based on "[t]he state's good or bad faith in failing to preserve the []tape," as well as "the degree of culpability on the part of the state, the importance of the evidence lost, the prejudice suffered by the accused, and the evidence of guilt adduced at the trial or hearing." *Thorne*, 774 P.2d at 1331. In *Thorne*, we determined that the appropriate sanction was a presumption that the contents of the videotape at issue would have favored the accused. *Id.*

## IV. CONCLUSION

For the reasons set forth above, we REVERSE the judgment of the superior court and REMAND to DMV for further proceedings consistent with this opinion.

EASTAUGH, Justice, dissenting.

EASTAUGH, Justice, dissenting.

### A. Introduction

I respectfully dissent from the conclusion that Trooper Tuckwood's investigatory stop was lawful. When he contacted Morgan Hartman, Trooper Tuckwood could not have had a reasonable suspicion that Hartman posed an imminent public danger because: (1) he knew the family car Hartman had been driving was no longer in Hartman's possession and was no longer available to Hartman because it was disabled and being towed; (2) he knew Hartman was only a passenger in someone else's car; and (3) he expressed no belief, reasonable or otherwise, that Hartman might begin to drive that car. The result the court reaches is therefore contrary to *Coleman v. State.*[1] It is also contrary to the three pertinent court of appeals decisions on which today's opinion relies.

I first discuss the lawfulness of the investigatory stop because the court's opinion focuses on that issue. Because I conclude that the investigatory stop was unlawful, it is also necessary to decide whether the unlawfulness of the stop affects the license revocation. The applicable statutes, AS 28.35.031(a) and AS 28.15.166(g), do not authorize the state to suspend a motorist's license on the basis of a search that is itself the product of an unlawful arrest. The arrest here was unlawful because it directly resulted from an unlawful stop. The license revocation should therefore be reversed.

### B. The Investigatory Stop Was Unlawful.

In *Coleman,* we articulated the standard for investigatory stops in Alaska: a police officer may make an investigatory stop only if he has "a reasonable suspicion that imminent public danger exists or serious harm to persons or property has recently occurred."[2] We recently reaffirmed our adherence to the *Coleman* standard in *Saltz v. State, Department of Administration, Division of Motor Vehicles.*[3] We also explained that a reasonable suspicion must be based on "specific and articulable facts" and a "totality of the circumstances."[4]

We have held that a sufficient imminent public danger exists for which an officer may make an investigatory stop if the officer has a reasonable suspicion that a person is driving while intoxicated.[5] But we have never considered whether a person who has ceased driving while intoxicated continues to pose an "imminent public danger" under *Coleman.* That case requires an officer to have a reasonable suspicion that imminent public danger *exists,* not that imminent public danger existed at some point in the past.[6]

In a series of cases—*Larson v. State,*[7] *Romo v. Municipality of Anchorage,*[8] and *Shearer v. Municipality of Anchorage*[9]—the court of appeals addressed whether, and under what circumstances, a person who was formerly driving while intoxicated but is no longer doing so continues to pose an imminent public danger under *Coleman.*

In *Larson,* a police officer observed a car stopped in the middle of the road, and then watched as the driver of the car (Larson) drove on the wrong side of the road, tried to pick up pedestrians, and almost hit a second

---

1. *Coleman v. State,* 553 P.2d 40 (Alaska 1976).

2. *Id.* at 46.

3. *Saltz v. State, Dep't of Admin., Div. of Motor Vehicles,* 126 P.3d 133, 136 (Alaska 2005).

4. *Id.*

5. *Id.; Ebona v. State,* 577 P.2d 698, 701 (Alaska 1978).

6. *See Coleman,* 553 P.2d at 46.

7. *Larson v. State,* 669 P.2d 1334 (Alaska App. 1983).

8. *Romo v. Municipality of Anchorage,* 697 P.2d 1065 (Alaska App.1985).

9. *Shearer v. Municipality of Anchorage,* 4 P.3d 336 (Alaska App.2000).

group of pedestrians.[10] The officer then witnessed Larson pick up two pedestrians, one of whom took over driving the vehicle Larson had been operating.[11] The officer stopped the car, immediately contacted Larson (who was then a passenger), observed that he appeared intoxicated, and arrested him for DWI.[12] Larson argued that the stop was unlawful and that therefore evidence of his intoxication should be suppressed.[13] The court of appeals rejected his argument. The court first reasoned that the officer's suspicion that Larson had been driving while intoxicated was reasonable given Larson's erratic driving.[14] The court then addressed "whether the requisite element of imminent danger terminated when Larson allowed an apparent stranger to drive the car in his place." [15] The court concluded that the district court had not clearly erred when it found that "it was likely that Larson would have resumed driving at some later point, and that [the officer] was not unreasonable in believing that the change of drivers did not eliminate the need to make an investigatory stop." [16]

In *Romo*, a police officer followed a truck after he recognized a known prostitute in the truck's front passenger seat.[17] The truck pulled into a parking lot and the driver (Romo) voluntarily exited the truck and approached the officer.[18] The officer noticed that Romo smelled of alcohol and Romo admitted to the officer that he had been drinking.[19] The officer then asked Romo to perform field sobriety tests; Romo failed the tests.[20] The court of appeals concluded that the investigatory stop commenced when the

officer asked Romo to perform the field sobriety tests and that the officer had sufficient reasonable suspicion at that point to warrant that request.[21] As the court explained:

> The fact that Romo was driving just prior to his encounter with [the officer] demonstrated Romo's willingness to drive in his current [intoxicated] condition. At the time of the encounter, Romo retained possession of his car and it remained immediately accessible for him to drive. Under these circumstances there was a sufficient risk of imminent public danger to warrant an investigatory stop.[22]

In *Shearer*, an off-duty police officer observed a Jeep speeding on the Glenn Highway and swerving between lanes without signaling.[23] The officer telephoned Anchorage Police Department dispatch for a check on the Jeep's license plates, determined where the owner lived, and followed the Jeep to the owner's residence.[24] The driver (Shearer) opened his garage door, parked the Jeep in his driveway, and exited the Jeep.[25] As Shearer headed into his house through the garage, the officer contacted him.[26] The officer noticed that Shearer smelled of alcohol and arrested him for DWI after he had difficulty performing field sobriety tests.[27] On appeal, Shearer conceded that he arguably posed an imminent public danger while he was driving home, but claimed that "because he parked his Jeep in his driveway, exited the vehicle and was headed towards his home when [the officer] contacted him, [the officer] had no basis to reasonably suspect that Shearer continued to pose an imminent dan-

---

10. *Larson*, 669 P.2d at 1335.

11. *Id.*

12. *Id.* at 1335–36.

13. *Id.* at 1336.

14. *Id.* at 1337.

15. *Id.*

16. *Id.*

17. *Romo*, 697 P.2d at 1067.

18. *Id.*

19. *Id.*

20. *Id.*

21. *Id.* at 1068–69.

22. *Id.* at 1069–70.

23. *Shearer*, 4 P.3d at 337.

24. *Id.* at 337–38.

25. *Id.* at 338.

26. *Id.*

27. *Id.*

ger to the motoring public." [28] The court of appeals rejected Shearer's argument because, as the court explained, at the time of his encounter with the officer, "Shearer retained possession of the vehicle and it remained immediately accessible for him to drive." [29]

Thus, under *Larson, Romo,* and *Shearer,* an officer may conduct an investigatory stop of a person who is no longer driving but is suspected of driving while intoxicated when (a) the driver just demonstrated his willingness to drive while intoxicated, and (b) the driver retains possession of his vehicle and it remains immediately accessible for him to drive.[30] The second prong of that analysis provides assurance that the officer has a reasonable suspicion that imminent public danger continues to exist even though the intoxicated driver was no longer driving.[31]

The court's opinion correctly reasons that Trooper Tuckwood had a reasonable suspicion for thinking that Hartman had been driving while intoxicated. But there is no justification for concluding that Hartman posed an imminent public danger at the moment he was contacted by Trooper Tuckwood. Trooper Tuckwood could not then have reasonably suspected that Hartman would again operate a vehicle that day. The Honda owned by Hartman's father was disabled and Trooper Tuckwood was having it towed. And there was no evidence Hartman might operate the tan Taurus in which he was now a passenger. Trooper Tuckwood never testified that he thought Hartman might drive the Taurus. As Hartman argues, the Taurus did not belong to him and he had manifested a "non-driving intention" as a passenger in the Taurus. Moreover, there was no indication the Taurus driver was impaired or might ask or permit Hartman to drive. Because Hartman was not in possession of a vehicle and no vehicle was

immediately accessible for him to drive, Trooper Tuckwood could not have reasonably suspected that imminent public danger existed when he stopped the Taurus, contacted Hartman, and saw that Hartman was merely a passenger in someone else's car.[32]

The court's opinion discusses *Larson, Romo,* and *Shearer.*[33] But in my view, the opinion recognizes but ultimately misapplies the factual justification that permitted the court of appeals to uphold the stops in those cases: the availability of a vehicle the defendant might drive and some likelihood he might actually drive it.[34] To uphold the stop here given the complete absence of any evidence and any administrative finding that there was any likelihood Hartman might drive the Taurus misapplies the court of appeals's decisions. And, given the circumstances here, it would mean police could find imminent public danger justifying an investigatory stop whenever a vehicle driver gives a ride to an intoxicated passenger, on a theory, unsupported by any evidence supporting a reasonable belief, the driver might relinquish the wheel to the visibly intoxicated passenger. No doubt such a relinquishment of control can occur. But absent evidence justifying some reason to think it is likely to occur, a DUI investigatory stop would not be sustainable in that case, nor is it in this case.

It is not just that those three court of appeals decisions uphold stops for reasons absent here. Our own case, *Coleman,* requires us to hold that the absence of any evidence that the trooper actually thought Hartman might drive the Taurus, and the absence of any evidence that would have made such a notion reasonable, is fatal to this stop. *Coleman* requires the officer to suspect that imminent public danger exists, not simply that it existed in the past.[35]

The state also argues that Trooper Tuckwood's investigatory stop was lawful because

---

**28.** *Id.*

**29.** *Id.* at 340 (internal quotation marks omitted).

**30.** *Id.; Romo,* 697 P.2d at 1069–70; *Larson,* 669 P.2d at 1337.

**31.** *See Coleman,* 553 P.2d at 46.

**32.** *See Shearer,* 4 P.3d at 340; *Romo,* 697 P.2d at 1069–70; *Larson,* 669 P.2d at 1337.

**33.** Op. at 1122–1124.

**34.** *Shearer,* 4 P.3d at 340; *Romo,* 697 P.2d at 1069–70; *Larson,* 669 P.2d at 1337.

**35.** *Coleman,* 553 P.2d at 46.

Trooper Tuckwood had a reasonable suspicion that "serious harm to persons or property ha[d] recently occurred."[36] The state suggests that Trooper Tuckwood may have stopped the Taurus to investigate whether a theft had been committed. But the Honda was never reported stolen, and Trooper Tuckwood never expressed any concern in his police report or his testimony that he thought the Taurus was stolen. And the only damage to the car that Trooper Tuckwood reported was that the Honda was "dented" and "leaking water or antifreeze."

The state cites *Gutierres v. State*[37] and argues that an officer may investigate a crime before he or she has specific knowledge that a crime has been committed. But an officer must still have specific and articulable facts supporting a reasonable suspicion that serious harm to property has recently occurred.[38] In *Gutierres,* an officer was patrolling a residential area in the middle of the night when he saw a man jump into the passenger side of a car in a back alley as the officer approached; the driver then swiftly backed the vehicle down the alley.[39] The court of appeals held that these were "sufficiently suspicious circumstances" to warrant an investigatory stop on the theory that there had been a potential burglary.[40] But here, Trooper Tuckwood did not testify that he had witnessed any suspicious circumstances suggesting a car theft. Instead, he reported and testified that he knew the Honda belonged to John Hartman; his report and testimony implied that he thought Morgan Hartman (John's son) had been driving the car because Morgan's friend lived nearby.

Because Trooper Tuckwood did not have a reasonable suspicion that imminent public danger existed or that serious harm to property had recently occurred, the investigatory stop was unlawful under *Coleman.*[41]

## C. Hartman's Driver's License Revocation Should Be Reversed.

Hartman's driver's license revocation should be reversed because the statutory provisions underlying administration of a breath test, the revocation of a driver's license, and the driver's license revocation appeal process are contingent upon a lawful arrest.[42] Alaska Statute 28.15.165(a) requires an officer to notify a person who has failed or refused to take a chemical or breath test administered under AS 28.35.031(a) that the department intends to revoke his driver's license and that he has a right to administrative review. Alaska Statute 28.35.031(a)—part of the implied consent statute—provides:

> A person who operates or drives a motor vehicle in this state ... shall be considered to have given consent to a chemical test or tests of the person's breath for the purpose of determining the alcoholic content of the person's blood or breath *if lawfully arrested* for an offense arising out of acts alleged to have been committed while the person was operating or driving a motor vehicle ... while under the influence of an alcoholic beverage, inhalant, or controlled substance.... The test or tests shall be administered at the direction of a law enforcement officer who has *probable cause to believe that the person was operating or driving a motor vehicle* ... in this state

---

36. *See Coleman,* 553 P.2d at 46.

37. *Gutierres v. State,* 793 P.2d 1078 (Alaska App. 1990).

38. *See Saltz v. State, Dep't of Admin., Div. of Motor Vehicles,* 126 P.3d 133, 136 (Alaska 2005).

39. *Gutierres,* 793 P.2d at 1079.

40. *Id.* at 1080.

41. *See Coleman,* 553 P.2d at 46.

42. *Thorne v. State, Dep't of Pub. Safety,* 774 P.2d 1326, 1331 (Alaska 1989) (stating that whether arresting officer had reasonable grounds to believe defendant was driving while intoxicated is issue of "central importance" in driver's license revocation proceeding); *Miller v. State, Dep't of Pub. Safety, Div. of Motor Vehicles,* 761 P.2d 117, 118–19 (Alaska 1988) (considering lawfulness of investigatory stop under *Coleman* ); *State v. Grier,* 791 P.2d 627, 630–31 (Alaska App.1990) (noting that because former AS 28.35.031(a) required probable cause to arrest, if arresting officer did not have probable cause to arrest defendant for driving while intoxicated, trial court properly suppressed defendant's blood and breath test results).

while under the influence of an alcoholic beverage....

(Emphasis added.) And AS 28.15.166(g) provides that a DMV hearing officer may consider two issues when reviewing the DMV driver's license revocation decision: first, whether the law enforcement officer had *"probable cause* to believe ... that the person was operating a motor vehicle ... while under the influence of an alcoholic beverage, inhalant, or controlled substance," and second, whether the person refused to submit to the chemical test or the chemical test produced a result indicating the person had a blood alcohol content at or above .08 percent. (Emphasis added.) Under AS 28.15.166(j), if one of the subsection .166(g) issues is determined in the negative by the hearing officer, "the department's action shall be rescinded."

Alaska Statute 28.35.031(a) and AS 28.15.166(g) require a driver's license revocation to be based upon a lawful arrest. Under AS 28.35.031(a), the state may not use breath test results that are obtained following an unlawful arrest. And under AS 28.15.166(j), the driver's license revocation must be rescinded if the officer did not have probable cause to believe that the person was operating a motor vehicle while intoxicated.

For reasons I explained in Part B, the investigatory stop was unlawful. The ensuing arrest was also unlawful because Trooper Tuckwood established probable cause to arrest Hartman with information gathered during the unlawful stop. "[A]n arrest is invalid if it follows as a consequence of and depends upon [an] unlawful stop.... [A]n unlawful stop may 'invalidate' an ensuing arrest ... through the exclusion of evidence garnered from the stop." [43] Without the investigatory stop, Trooper Tuckwood would not have had probable cause to arrest Hartman for driving

while intoxicated. It was only after the stop that Trooper Tuckwood confirmed the identity of the driver of the Honda or had any evidence (aside from the smell of alcohol in the Honda) of Hartman's intoxication. Because a driver's license revocation is premised on a lawful arrest, and because Trooper Tuckwood's arrest of Hartman was unlawful, we should reverse his driver's license revocation.[44]

### D. Conclusion

Because the statutory provisions governing driver's license revocation proceedings do not authorize the state to revoke a motorist's driver's license on the basis of a search that itself is the product of an unlawful arrest, and because the arrest here was unlawful, we should reverse Hartman's driver's license revocation.

---

43. *Pooler v. Motor Vehicles Div.,* 306 Or. 47, 755 P.2d 701, 703 (1988).

44. Because the statutes prohibit the state from revoking a motorist's driver's license on the basis of a search that is itself the product of an unlawful arrest, it is not necessary to consider whether the exclusionary rule should also operate in this context to suppress the breath test result obtained after the unlawful investigatory stop. *See Nevers v. State, Dep't of Admin., Div. of Motor Vehicles,* 123 P.3d 958, 963 n. 21 (Alaska 2005)

(holding that although exclusionary rule does not apply to search and seizure violations in administrative driver's license revocation proceedings, there may be potential exceptions, as when "a Fourth Amendment violation stems from a lack of probable cause for a DWI arrest").

This court's opinion remands for a new hearing because it concludes that the procedure followed by the hearing officer at the hearing violated Hartman's due process. Op. at 1126. The result I believe to be required here also makes it unnecessary to decide that procedural issue.